**Jeffery Wayne CHAVIES, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000140–MR.

Supreme Court of Kentucky.

Aug. 23, 2012.

314

Erin Hoffman Yang, Assistant Public Advocate, Frankfort, KY, for Appellant.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, for Appellee.

## OPINION OF THE COURT

Jeffery Wayne Chavies appeals from his conviction of eight counts of first-degree sodomy, one count of use of a minor in a sexual performance, and one count of first-degree sexual abuse, for which he received a total sentence of 70 years' imprisonment. Because the Commonwealth's introduction of an egregious amount of inadmissible character evidence combined with improper bolstering of the alleged victims' testimony rises to the level of palpable error in this case, we must reverse and remand for a new trial.

In 1998 or 1999, Appellant began a relationship with Susanna Brooks, who lived in Ohio. Brooks had three children from a previous relationship, daughters L.B. and A.B., and a son, T.B. In 1999, Appellant, Brooks, and the children moved to Knox County, Kentucky. Brooks and Appellant subsequently had two children together, daughters M. and M.C.[1] The charges in this case stem from allegations that Appellant sexually abused L.B. and A.B.

L.B. initially made allegations against Appellant around Halloween of 2008 when she was 16 years old. Brooks had forbidden L.B. to go to a Halloween party that L.B. wanted to attend. L.B. went to the party anyway, leaving a note for Brooks saying that she went because she wanted to get away from Appellant because he was molesting her. Brooks confronted A.B. (who was at home) with L.B.'s allegation, and A.B. told her that Appellant was abusing her too. Brooks called Appellant, who was out with his friend Charles "Charlie Pete" Barton. Appellant denied the allegations and said he was coming home. A.B. recanted when she heard that Appellant was coming home. L.B. recanted the next day when she came home from the party. L.B. told Brooks that she was sorry and that she had made up the story because she wanted to go to the party.

On August 14, 2009, L.B. told her high school music teacher, Eddie Campbell, that Appellant was sexually abusing her. Campbell immediately took L.B. to the guidance counselor's office, and law enforcement was contacted. L.B. and A.B. were interviewed by social worker Ewell Daniels and Knox County Sheriff's Deputy John Whitehead. A.B. initially denied that Appellant had ever abused her. However, after Deputy Whitehead told A.B. he could tell she was lying, A.B. said she, too, had been abused. Appellant was interviewed by Daniels and Whitehead as well, and

1. Because these children have the same initials, they shall be referred to as "M." and "M.C."

denied the allegations. Appellant was ultimately charged with ten counts of first-degree sodomy (three as to L.B. and seven as to A.B.), ten counts of first-degree sexual abuse (three as to L.B. and seven as to A.B.), and one count of using a minor in a sexual performance (L.B.). The indictment alleged the incidents took place during a time period from January 2004 through December 2008 as to L.B. (when she would have been 12 to 16 years old), and from January 2003 through August 2009 as to A.B. (when she would have been 12 to 17 years old). At trial, the indictment was amended to reflect L.B.'s testimony that she was abused in 2009 as well.

L.B. was eighteen years old at the time of trial. She testified that Appellant began abusing her when she was eleven or twelve years old. The first incident occurred after Appellant had come into her room and asked her to "check his hair." L.B. testified that Appellant worked at a sawmill at the time, and would sometimes make her check his hair for bugs and dander. On this occasion, Appellant told her she smelled and to change clothes. The next day, he told her that he had watched her change clothes and "wanted to see more." L.B. claimed that after this, at times he would make her undress, and then throw something and ask her to pick it up while he watched. L.B. testified that Appellant started touching her sexually when she was about fourteen or fifteen years old. She described the first incident of touching as Appellant putting his hand down her pants. L.B. testified that Appellant subsequently began putting his tongue in her vagina. Appellant told her that if she did not keep letting him do these things he would kill her mother.

L.B.'s testimony regarding when and how often the abuse occurred was at times vague and unsure. She agreed with the prosecutor, however, that she was abused during 2006, 2007, 2008, and 2009. L.B. testified that, although the family lived in a single-wide trailer during this time,[2] her siblings and mother were unaware of the abuse because it happened when her mother was at work, and/or when everyone else was outside, or asleep. L.B. estimated the total number of times she was abused as "too many to count."

L.B. admitted that she had initially told social services that she had made Appellant stop abusing her when she was about fifteen or sixteen. She testified that this was not true and that the incidents just happened less often after she accused him of abuse in October 2008. L.B. admitted that she told the Children's Advocacy Center interviewer that Appellant had abused her a total of only five or six times. L.B. testified that she had said this because she has a hard time confiding in strangers. L.B. testified that she was telling the truth now (at trial) because she had to. L.B. admitted that she had been grounded from a school trip to Dollywood at the time she made the accusations on August 14, 2009, that Appellant was removed from the home that day, and that she got to go on the trip. L.B. testified, however, that she had decided to tell at that time because Appellant had given her a deadline that she had to let him touch her that day or she would watch her mother die. L.B. testified that she recanted her Halloween 2008 accusation because she was afraid of Appellant.

A.B. was nineteen years old at the time of trial. A.B. testified that at first Appellant would put his head in her lap and ask her to "pick his hair." She testified that, looking back, she realized he had been "smelling" her for sexual gratification. Appellant subsequently began calling her

---

**2.** At some point, a second single-wide trailer was joined to the original.

to his bedroom, where he would put his tongue on her vagina. Eventually, he began making her put her mouth on his penis. He threatened that he would kill her mother if she told. A.B. testified that she believed him because she had once seen him pull a knife on someone he believed had stolen from him. A.B. was unsure of the total number of times the abuse happened, but agreed with the prosecutor that it happened more than fifty times. A.B. said that she recanted her Halloween 2008 accusation because she was afraid Appellant would hurt her and her mother.

A.B. acknowledged that when she was interviewed by social services and Deputy Whitehead on August 14, 2009, she initially said nothing had happened to her, and that only after Whitehead told her he could tell she was lying did she say she had been abused. A.B. admitted that she "very much [has] problems with [her] memory," and acknowledged that L.B. helped "jog [her] memory a lot" about how old she was and what grade she was in when the abuse happened.

The defense theory was that L.B. and A.B. did not like Appellant because he was strict, and had fabricated the allegations in order to get him out of the house. Appellant testified in his own defense and denied all of the allegations. He testified that around the time L.B. made the Halloween 2008 allegation, she was angry at him for threatening to rip the "nutsacks" off of her boyfriend and another boy if they came on his property again. He testified that when L.B. made the August 2009 allegation, he had just grounded her from going on a school trip to Dollywood as punishment for having brought a cat into the house after he told her not to. Appellant testified that after L.B. made the allegation, he was arrested and she got to go on the trip. Appellant admitted that the girls and

Brooks would "pick" his hair, but that this consisted of having them look for ticks in his hair, which he would pick up from his job at the sawmill.

The defense additionally called a number of witnesses (Appellant's mother Pauletta Chavies; sister Liz Chavies; and three friends, "Charlie Pete" Barton; Charles Skaggs; and Anthony Skaggs) who had spent considerable time with the family, none of whom had seen or suspected anything inappropriate between Appellant, and L.B. or A.B. The defense also called Appellant's two daughters with Brooks, M., age 10, and M.C., age 9, neither of whom testified to having seen anything sexually inappropriate. On cross-examination, M. and M.C. testified that they had seen A.B., but not L.B., "pick" Appellant's hair. M. described this as where A.B. would comb the back of his hair to get "gnats and stuff" out. M.C. said that A.B. would check all of their hair to see if they had anything in it and would sometimes braid Appellant's hair.

The jury was ultimately instructed on three counts of first-degree sodomy, one count of first-degree sexual abuse, and one count of using a minor in a sexual performance as to L.B., and five counts of first-degree sodomy as to A.B. Appellant was found guilty on all counts and sentenced to a total of 70 years' imprisonment. He appeals to this Court as a matter of right.

## I. INADMISSIBLE CHARACTER EVIDENCE

■ Appellant first argues that the Commonwealth's repeated elicitation of testimony that Appellant was a loser who smoked marijuana, was unemployed, and looked at pornographic magazines denied him a fair trial. Appellant contends that none of the testimony was relevant to the crimes charged, and had the effect of prejudicing the jury against him. Appellant

concedes the errors in this regard are unpreserved, and requests review per RCr 10.26.

Appellant points to numerous instances at trial where the alleged improper character evidence was introduced, including the following:

*Direct examination of Susanna Brooks:*

Commonwealth: Did Mr. Chavies work anywhere during that time [the past ten or twelve years since the family moved to Knox County]?

Brooks: He worked at the saw mill. When we very first moved down here, he worked with Phillips Tree Service, and he also worked for Hensley Septic, and then he started doing some odd jobs for Long John Silver's.

Commonwealth: More often than not has he been unemployed?

Brooks: Yes.

Commonwealth: Would it be fair to say that he has seldom been employed? I know there's a lot of unemployed people, but has he very seldom been employed in the time with you?

Brooks: In comparison to the years that we've been together?

Commonwealth: Yeah, how much of that time did he work a steady job where he got up and went to work every day? Monday through Friday or Monday through Wednesday?

Brooks: I guess it would have to be seldom in comparison.

Commonwealth: Seldom.

. . . .

Commonwealth: Would Jeff Chavies use alcohol or drugs in the home?

Brooks: Not alcohol, very rarely alcohol.

Commonwealth: Did he use anything? Used . . .

Brooks and Commonwealth (simultaneously): Marijuana.

Commonwealth: What's your answer?

Brooks: Marijuana.

Commonwealth: Marijuana was commonplace?

Brooks: Yes.

Commonwealth: Marijuana was used on a weekly or daily basis?

Brooks: Daily.

Commonwealth: Daily marijuana use by Jeff Chavies?

Brooks: Yes.

Commonwealth: Did you use marijuana with him?

Brooks: Occasionally.

Commonwealth: In front of the children?

Brooks: No.

Commonwealth: When would you smoke marijuana with Chavies?

Brooks: Usually in the evenings when the kids were in bed.

. . . .

Commonwealth: You tried to bring a paycheck in working 40, 45 hours a week at a restaurant. He did nothing . . . he didn't do much of anything to bring in any money, did he? And I'm assuming that you all had to pay for the marijuana, would that be a fair assumption?

Brooks: Yes.

Commonwealth: So he was worth nothing economically to your family, was he?

Brooks: He was building.

Commonwealth: Steadily, or just every now and then?

Brooks: Well, we were trying to put together two trailers, to make a larger house type thing.

Commonwealth: For the seven of you to live in?

Brooks: Right.

. . . .

Commonwealth: Tell the jury what you know about his [Appellant's] controlling nature.

Brooks: The kids really weren't allowed to have friends over, which was something that always bothered me, but he smoked pot so often that I didn't fight him on that.

Commonwealth: That's what I thought you were gonna say. Can't have friends over if you're gonna sit around and smoke dope all the time can you? They might go tell.

Brooks: Well, not about go and tell. I didn't want them exposed to it.

Commonwealth: Did your girls, or your son, did they have friends from families that you would suspect didn't smoke marijuana in the house?

Brooks: I didn't really know their friends back then.

*Direct Examination of A.B.:*

Commonwealth: Crazy as it might sound, did you end up saying, October 31, 2008, that it didn't happen, because you wanted your mom to stay with him [Appellant]?

A.B.: No, I just didn't want to see her die.

Commonwealth: Okay. But, [A.B.], you said he abused you again a week or two later? Did you not want your mother to be faced with trying to find another man? I know you said you didn't want her to die, I understand that. But did you also not want her to be faced with having to find another loser somewhere? Like the losers she's always had? Does that make any sense?

A.B.: (Shakes head "no")

Commonwealth: Did you want him to stay there in large part, or in any part, because he was the father of your two little sisters—your two younger sisters? Lord knows I am not trying to be hard on you right now, feel like you're being abused here in this courtroom, but I am just trying to get you to tell the truth, why on that night [she and L.B. both recanted].

. . . .

Commonwealth: He didn't support you all any economically, did he? He just sat there and smoked dope and abused the two pretty, young teenagers. It's really all he did, didn't he?

Defense Counsel: Is that a question, Judge?

Commonwealth: That's the question. That's really all he did is sat there and smoked dope and abused two pretty, young teenagers while their mom worked at McDonald's or Long John Silver's or somewhere. That's really what he did, wasn't it?

A.B.: Yes.

Commonwealth: That's what he's all about, isn't it [A.B.]?

A.B.: Yes.

*Direct examination of social worker Ewell Daniels:*

Commonwealth: Did [Appellant] admit to marijuana usage?

Daniels: Yes, he said he smoked marijuana daily in his bedroom.

Commonwealth: What else did he say about marijuana?

Daniels: He told me that he locked himself in the bedroom and used it daily and that it was all his. That all the marijuana in the home was his.

Commonwealth: All the marijuana in the home was his?

Daniels: Correct.

Commonwealth: Did he make reference to Susanna [Brooks] and whether or not she used marijuana?

Daniels: He denied that Susanna had ever smoked marijuana with him.

*Direct examination of Deputy John Whitehead:*

Commonwealth: What other physical evidence did you recover [from Appellant's home]?

Deputy Whitehead: We recovered a lot of drug paraphernalia, marijuana, pipes, smoking pipes, also recovered a 12–gauge shotgun and some ammunition that was in a building that Mr. Chavies claimed that that's where he spent most of his time.

Commonwealth: Did Mr. Chavies claim ownership of the drugs and drug paraphernalia?

Deputy Whitehead: Yes sir, he did. Said it was his.

Commonwealth: Said it was his. Find any magazines?

Deputy Whitehead: Yes, sir.

Commonwealth: What kind of magazines?

Deputy Whitehead: Pornographic magazines. Of women.

Commonwealth: Pornographic magazines?

Deputy Whitehead: Yes, sir.

*Cross-examination of "Charlie Pete" Barton:*

Commonwealth: Did you smoke marijuana with Jeff Chavies?

Barton: Yes, sir.

Commonwealth: In that house?

Barton: Yes, sir.

Commonwealth: In front of those kids?

Barton: No, the kids wasn't in there.

. . . .

Commonwealth: You say you were in that house on a daily basis, that's your words, I believe, on a daily basis.

Barton: When I wasn't working, yes.

Commonwealth: I've got some friends, but I don't know that I've got any friends I'd want in my house on a daily basis, why were you there on a daily basis?

Barton: I just stopped by.

Commonwealth: To smoke dope?

Barton: No, not always.

. . . .

Commonwealth: Did [Appellant] ever work a steady job very long?

Barton: Yes.

Commonwealth: Which one?

Barton: At the saw mill.

Commonwealth: How long did he work there?

Barton: Three years, I think.

Commonwealth: Worked steady for three years?

Barton: Yeah.

Commonwealth: Most of the family income was brought in by Susanna though, wasn't it?

Barton: Yeah.

Commonwealth: When you'd stop by there, more often than not, would you smoke marijuana with him?

Barton: No.

Commonwealth: How often would you smoke marijuana with Jeff Chavies?

Barton: Once or twice a week.

Commonwealth: How did you all become friends?

Barton: I met him through friends of mine.

Commonwealth: Mutual friends?

Barton: Yes sir.

Commonwealth: What kind of people are they?

Barton: Just friends I went to school with.

Commonwealth: Other people that you smoked dope with?

Barton: No, sir.

*Cross-examination of Pauletta Chavies:*

Commonwealth: Did you ever see Jeff smoke marijuana when you would be there [at Appellant's home]?

Pauletta Chavies: No.

Commonwealth: Did you know he that smoked, or smokes, marijuana?

Pauletta Chavies: No, sir, I don't.

Commonwealth: Did you know that he told this man and this man (indicating Deputy Whitehead and Ewell Daniels) that he'd lock himself in the bathroom and smoke marijuana all day long?

Pauletta Chavies: No sir, I didn't know he told them that.

*Cross-examination of M. (age 10):*

Commonwealth: Did you ever see him smoke marijuana? Did he do that quite often?

M.: (shakes her hand)

Commonwealth: What does that mean, shaking your hand?

M.: Sometimes. Every now and then.

Commonwealth: Every now and then. But he did it kind of on a regular basis, do you know what I mean by that, [M.]?

M.: Umm ... like, three times every day or something?

Commonwealth: Well, did he do it at least once a week?

M.: I don't really know that.

*Cross-examination of Liz Chavies:*

Commonwealth: Did you know that he [Appellant] habitually smoked marijuana in front of them [the children]?

Liz Chavies: No. Not in front of them, no.

*Cross-examination of Appellant:*

Commonwealth: You did smoke a lot of marijuana around the house, didn't you?

Appellant: On occasion, yes.

Commonwealth: Did you tell [Ewell Daniels and Deputy Whitehead] that you locked yourself in the bathroom all day and smoked dope?

Appellant: No.

Commonwealth: You didn't tell them that?

Appellant: No, I have a deadbolt on my bedroom door.

Commonwealth: Bedroom, did you tell them you locked yourself in the bedroom?

Appellant: Yes.

Commonwealth: Bedroom.

Appellant: I keep an air conditioner going and keep a fan going, but I never stayed in there all day long, no.

. . . .

Commonwealth: [Susanna Brooks] really made the living, didn't she?

Appellant: At times, yes, she did.

Commonwealth: And there was a list of jobs you had there—I counted four in twelve years—you never really worked a steady job, did you?

Appellant: Yeah, I did. Did I always sit home and smoke dope? No. Did I smoke dope? Yes. Did I ever smoke it when I was working? No.

Commonwealth: Put it this way, work never really got, uh, used to know a fella, his byline was he wouldn't let work get in the way of a good time. That's kind of the way you were, wasn't it. You didn't let your job get in the way of dope smoking, did you?

Appellant: ... you gotta say that better, so I can understand it. Did I rather smoke dope than work?

Commonwealth: Work never really interfered with your dope smoking, did it?

Appellant: Okay, to answer that one, no, it didn't. Did I sit and play hookey from work? No, no.

*Cross–Examination of Anthony Skaggs:*

Commonwealth: Twenty-four years old and you're in jail right now though, right? Twenty-four years old and you've got a son and another one on the way and you're gonna tell this jury what a nice fella the Defendant is? That's about what you're here for, isn't it?

Skaggs: Yes.

Commonwealth: What if I told you that the County or the State had to utilize their public assistance program to repair the windows and the heat? Would you believe that?

Skaggs: I wouldn't know nothing about it.

On appeal, Appellant contends that the testimony regarding his marijuana use, possession of pornography, and unemployment/poverty violated KRE 404(a) and (b). Appellant contends that this evidence was irrelevant as it was not linked in any way to the charged crimes, and was used only for the improper purpose of showing he was of bad character. Appellant concedes that the errors are unpreserved, as defense counsel failed to object at trial, and requests palpable error review per RCr 10.26. Appellant contends the admission of this evidence denied him a fair trial.

We agree with Appellant that the aforementioned testimony was error. In *Bell v. Commonwealth,* we held that evidence of the defendant's marijuana use in a trial for sexual abuse ran afoul of KRE 404(b), where the marijuana use was not linked to the charged crimes. 245 S.W.3d 738, 743

(Ky.2008), *overruled on other grounds by Harp v. Commonwealth,* 266 S.W.3d 813 (Ky.2008). Similarly, the evidence of marijuana use was inadmissible in the present case, as the Commonwealth presented no evidence whatsoever linking Appellant's use of marijuana to the charged crimes. Moreover, we have also consistently held that evidence that a defendant possessed pornography is inadmissible where the pornography is not linked to the charged crimes. *Dyer v. Commonwealth,* 816 S.W.2d 647, 651–52 (Ky.1991), *overruled on other grounds by Baker v. Commonwealth,* 973 S.W.2d 54 (Ky.1998) ("citizens and residents of Kentucky are not subject to criminal conviction based upon the contents of their bookcase unless and until there is evidence linking it to the crime charged"); *see also Jones v. Commonwealth,* 237 S.W.3d 153, 160–61 (Ky.2007). The Commonwealth presented no evidence linking the pornography found in Appellant's storage building with the charged crimes. Accordingly, this evidence was inadmissible as well.

Finally, the prosecutor's repeated attempts to elicit testimony that Appellant had a poor work history and depended on his wife for the family's support, and that he utilized public assistance, was improper. This evidence was not relevant to the crimes charged, and was elicited for the sole purpose of impugning his character, i.e., to show that he was a "loser." Hence its admission violated KRE 404(a). *See Jarvis v. Commonwealth,* 960 S.W.2d 466, 471 (Ky.1998) (evidence used only to paint defendant in a bad light should have been excluded under KRE 404).[3]

## II. IMPROPER BOLSTERING OF L.B. AND A.B.'S TESTIMONY

The Commonwealth called A.E., a friend of L.B. and A.B., as its second

---

**3.** We note that in its brief to this Court, the Commonwealth makes no attempt to counter

witness.[4] A.E. testified that she knew both A.B. and L.B., but was better friends with L.B. because they were in the same grade at school. The Commonwealth then elicited testimony from A.E. that in May of 2008, L.B. told her that Appellant was sexually abusing her. The Commonwealth asked A.E. if she believed L.B., and A.E. replied affirmatively. Shortly thereafter, the Commonwealth again asked A.E. if L.B. "seemed very trustworthy and believable." A.E. again replied affirmatively. As its next witness, the Commonwealth called L.B.'s high school music teacher, Eddie Campbell. Campbell testified that in August 2009, L.B. told him that Appellant was sexually abusing her.

Appellant contends that the aforementioned testimony by A.E. and Campbell, repeating L.B.'s allegations of abuse, was inadmissible hearsay that improperly bolstered L.B. and A.B.'s testimony. Appellant concedes the error is unpreserved and requests review per RCr 10.26.

We agree that the testimony was error. There is no hearsay exception for statements made by an alleged victim of sexual abuse to a friend or teacher. Nor, under the facts of this case, was the hearsay admissible under any other exception.[5] Accordingly, it was error for A.E. and Campbell to repeat L.B.'s allegations of sexual abuse. We have consistently recognized that such testimony is highly prejudicial and unfairly bolsters the credibility of the alleged victim. *Hoff v. Commonwealth*, — S.W.3d —, — — —, 2011

WL 6542997 (Ky.2011); *Alford v. Commonwealth*, 338 S.W.3d 240, 246 (Ky.2011). Further, with regard to A.E.'s testimony that L.B. seemed believable and trustworthy, it is well-settled that a witness may not vouch for the truthfulness of another witness. *Stringer v. Commonwealth*, 956 S.W.2d 883, 888 (Ky.1997). Hence, the admission of this testimony was error as well.

### III. GROSS PROSECUTORIAL MISCONDUCT

■ Appellant also requests review per RCr 10.26 of a number of instances of alleged prosecutorial misconduct, which he argues denied him a fair trial. Having reviewed the entire trial record, we agree there was prosecutorial misconduct. Throughout the trial, the prosecutor made sarcastic comments, expressed opinions about the testimony given, asked improper leading questions, made statements of fact outside of the evidence prejudicial to Appellant, and asked questions on cross-examination without a good-faith basis (in particular, asking, *without a good-faith basis* and with an intent to impugn their character, whether Appellant and three defense witnesses had been convicted of a felony).[6]

### IV. PALPABLE ERROR

■ We now turn to the question of whether the aforementioned errors rise to the level of palpable error in this case. A party claiming palpable error must show a

---

Appellant's argument that all of the aforementioned character and prior bad acts evidence was inadmissible. While not conceding error, the Commonwealth simply requests this Court to hold any error non-palpable.

**4.** The Commonwealth's first witness was Susanna Brooks.

**5.** Again, we note that the Commonwealth makes no attempt to counter Appellant's argument that the hearsay was inadmissible.

While not conceding error, the Commonwealth simply requests this Court to hold any error non-palpable.

**6.** While KRE 609 permits impeachment with a felony conviction, the Commonwealth "may not deliberately inject into the case an issue prejudicial to the rights of defendant without some reasonable basis for the questions." *Rowe v. Commonwealth*, 269 S.W.2d 247, 249 (Ky.1954). When asked if they were convicted felons, neither Appellant nor the three wit-

probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law. *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006). Justice Cunningham, in his concurring opinion in *Alford v. Commonwealth,* once described the threshold for palpable error: "It should be so egregious that it jumps off the page ... and cries out for relief." 338 S.W.3d 240, 251 (Ky.2011). The case before us is such a case.

From the beginning of trial to the end, the prosecutor, without objections from defense counsel, was a runaway train—committing voluminous intentional errors meant to prejudice the jury against the Appellant based on evidence of his character, rather than on evidence of the crime.[7] There was no physical or other corroborating evidence of the charged crimes in this case. In fact, the alleged victims had both changed their stories a number of times. This was a "he said/ she said" case, entirely dependent on the jury believing L.B. and A.B. and disbelieving the Appellant.

To rouse the jury's emotions against the Appellant, the prosecutor, in violation of KRE 404(a) and (b), obsessively focused on attacking his character (through practically every witness) to show that he was a low-life and a loser—someone who smoked "dope," could not hold a job, relied on his wife to support the family, and enjoyed pornography. The "dangerous quality and prejudicial consequences" of KRE 404(a) and (b) violations is well-established by our precedent. *See Driver v. Commonwealth,* 361 S.W.3d 877, 883 (Ky.2012) (quoting *O'Bryan v. Commonwealth,* 634 S.W.2d 153, 156 (Ky.1982)); *Clark v. Commonwealth,* 223 S.W.3d 90, 96 (Ky.2007). To bolster the credibility of the alleged victims, the prosecutor called two witnesses to repeat L.B.'s allegations of sexual abuse, an error we have also consistently recognized as highly prejudicial. *See Hoff,* ── S.W.3d at ── ─ ──; *Alford,* 338 S.W.3d at 246.

Guilt or innocence in this case came down to the alleged victims' word against the Appellant's. The Appellant spending the next 70 years in the penitentiary came down to credibility. *See Alford,* 338 S.W.3d at 251 (Cunningham, J., concurring). While the threshold for palpable error is high, this Court cannot ignore the sheer volume of intentional errors in this case meant to prejudice the jury against the Appellant based on his character and not the evidence of the crimes. It "jumps off the page." *Id.* The cumulative effect of these highly prejudicial errors, combined with the improper bolstering of the alleged victims' credibility, undeniably deprived Appellant of a fair trial, and rises to the

---

nesses answered in the affirmative. Appellant makes a valid point that it is unlikely the Commonwealth had a good-faith basis for asking Appellant if he was a convicted felon, because past felonies would have been admissible in the penalty phase if they existed. Further, after defense witness Anthony Skaggs responded that he had not been convicted of a felony, the prosecutor went on to improperly impeach him with a misdemeanor conviction. When defense counsel objected, the prosecutor agreed this was error, after which the parties agreed that an admonition would only compound the error. Appellant contends that because the prosecutor was aware of Skaggs' misdemeanor conviction, it is unlikely that he was unaware of Skaggs'

lack of felon status, as well as that of the other two defense witnesses. As was the prosecutor's practice throughout the trial, it appears that he was simply taking every opportunity to use the word "felony" to insinuate that Appellant associated with felons in order to impugn his character. We trust this error will not occur on retrial.

7. Why defense counsel was complacent with the prosecutor's conduct is unknown to this Court. Nevertheless, "the defense lawyer is not the only lawyer in the courtroom who has an obligation to follow the rules of evidence and pursue the ends of justice." *Alford,* 338 S.W.3d at 251 (Cunningham, J., concurring).

level of palpable error—it "cries out for relief." *Id.*; RCr 10.26. As this case must be remanded for retrial, we need not address Appellant's arguments regarding prosecutorial misconduct, other than to say we trust the errors will not be repeated on retrial.

For the aforementioned reasons, the judgment of the Knox Circuit Court is reversed and the case remanded for a new trial or other proceedings consistent with this opinion.

All sitting. All concur.