# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$



2018-SC-000409-MR

DATE 11/25/19

JASON A. WATTS          APPELLANT

ON APPEAL FROM LYON CIRCUIT COURT
V.      HONORABLE CLARENCE A. WOODALL III, JUDGE
NOS. 16-CR-00097, 16-CR-00098,
16-CR-00099, 16-CR-00100, 16-CR-00101

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Lyon County jury convicted Jason A. Watts of one count each of second-degree unlawful transaction with a minor, third-degree sodomy; second-degree sodomy, and first-degree rape (victim under twelve), and two counts of third-degree rape. Watts received a sentence of life imprisonment on the first-degree rape conviction, ten (10) years on the second-degree rape conviction, and five (5) years each on the remaining charges. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Lyon Circuit Court.

# I. BACKGROUND

In 2013 or 2014, Watts divorced his wife and took his daughter, K.W.,[1] and his two sons to live in Lyon County. During that time, Watts and his children resided in a house on Watts's parents' property. The home was referred to as the "rec house" because there was a pool table in one of the rooms. While living at the rec house in April of 2014, K.W., approximately eleven years old,[2] had her first period. A few weeks later, her father had sex with her for the first time.

While residing in the rec house, K.W. befriended an older girl, M.W. M.W. was approximately two years older than K.W. and would sometimes babysit the Watts children. She would also spend the night at the rec house. The first time that M.W. spent the night at the rec house, M.W. asked K.W. to "hook [her] up" with Watts. That night, Watts gave the girls marijuana to smoke. Later that same night, after the girls had gone to bed, K.W. woke up and realized that M.W. and Watts were in the bathroom. K.W. could hear heavy breathing and voices coming from the bathroom. The next morning, M.W. revealed to K.W. that she and Watts had had sex the night before.

In or around August 2014, when K.W. was approximately twelve years old, Watts moved the children to Paducah, Kentucky, where he had a girlfriend.

---

[1] The juvenile victims will be identified by their initials.

[2] K.W.'s testimony as to the exact dates of these events is unclear. She testified that she had her first period just before she turned eleven years old but later acknowledges that the first instance of rape occurred in April 2014, when she would have already turned eleven years old.

During that time, Watts did not sexually abuse K.W. K.W. testified at trial that he "would not touch [her] when he had a girlfriend." However, M.W. visited the Watts family in Paducah on at least two occasions and had sex with Watts on at least one of those visits. After a few months,[3] Watts and his girlfriend ended their relationship, and Watts moved the family back to Lyon County. This time, they moved to a trailer on Jenkins Road.

Upon returning to Lyon County, M.W. and K.W. rekindled their friendship. M.W., approximately fourteen years old, visited the trailer almost every day. At trial, M.W. testified that she had sex with Watts at the Jenkins Road trailer "quite a few times." K.W. also testified that she witnessed M.W. in Watts's bed having sex with Watts on at least one occasion. On another day, Watts, K.W., and M.W. were in Watts's room when Watts had K.W. "masturbate him" and give him oral sex. K.W. believed that M.W., who was seated nearby, saw K.W. masturbating Watts. In fact, M.W. testified at trial that she witnessed K.W. sitting with Watts with a blanket over them. M.W. testified that she saw K.W.'s hand under the blanket moving up and down. On another occasion, K.W. recalled lying on her back in Watts's bedroom while Watts had sex with her when her grandmother, Fonda Watts, walked in. K.W. did not speak with her grandmother about the incident.

About two weeks after this incident, in December 2015, the sexual abuse was reported to law enforcement. The matter was reported after a student

---

[3] The exact date that the family moved back to Lyon County is unclear. However, K.W. testified that it was sometime during her seventh-grade year.

3

heard that M.W. and K.W. were in sexual relationships with Watts and reported this to a teacher. The matter was initially investigated by Kentucky State Police Trooper Christopher Smith, but that investigation was eventually closed because Trooper Smith thought that it might be possible Watts was telling the truth when he denied the allegations. Meanwhile, in December 2015, Kentucky State Police Officer (now Detective) Eric Fields began investigating the allegations concerning M.W. Upon learning about the allegations concerning K.W., he reopened that case and took over both investigations. As a result of these investigations, K.W. and her brothers were removed from Watts's home. Several months later, on May 22, 2016, Detective Fields interviewed Watts. Unfortunately, according to Detective Fields's testimony at trial, he did not seek a search warrant allegedly because several months had passed since the children's removal and Watts claimed he had already removed all of the children's belongings from his home, including a mattress.

Throughout the period of abuse, K.W. kept several journals, including one for her dreams, one for her feelings, and one for her poetry. She also had a cell phone, which allegedly contained recordings of Watts "saying sexual things" as well as recordings of Watts physically abusing his son. K.W. was unable to retrieve these items before she was removed from her father's home. At trial, Watts admitted into evidence some but not all of the journal entries during his cross-examination of K.W. Watts himself testified that he had looked for but could not find the cell phone.

4

A Lyon County jury found Watts guilty of second-degree unlawful transaction with a minor, third-degree sodomy, second-degree sodomy, first-degree rape (victim under twelve), and two counts of third-degree rape. This appeal followed as a matter of right.

## II. ANALYSIS

In his appeal, Watts asserts various errors. First, he argues that it was error to allow evidence of his prior drug and alcohol use, evidence related to payment of his bond and legal fees, and testimony suggesting that he hid or destroyed evidence. Next, he argues that he was denied the right to present a complete defense because (1) he was unable to introduce evidence of the victims' alleged use of a sex toy and M.W.'s sexually transmitted disease ("STD") under Kentucky Rule of Evidence ("KRE") 412 and (2) his cross-examination of K.W. was limited in scope. Lastly, he argues that the exhibits introduced during the penalty phase of his trial exceeded the scope of Kentucky Revised Statute ("KRS") 532.055. If none of these alleged errors alone merit relief, Watts argues that, taken together, they constitute cumulative error and warrant reversal of his conviction and sentence. We address each of his arguments in turn.

### A. Irrelevant and Unduly Prejudicial Evidence

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Under KRE 402, "[a]ll relevant evidence is admissible" unless

otherwise excluded by the law or our rules of evidence. "Evidence which is not relevant is not admissible." KRE 401. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Unduly prejudicial evidence has been defined as evidence that "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *Richmond v. Commonwealth*, 534 S.W.3d 228, 232 (Ky. 2017) (quoting *Butler v. Commonwealth*, 367 S.W.3d 609, 615 (Ky. App. 2012)) (internal quotation marks omitted).

Contrasted with these general rules of relevance is "the equally venerable rule that a defendant may not be convicted on the basis of low character or criminal predisposition, *even though* such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense." *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992). Thus, under KRE 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible, however, "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). It may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that

6

separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). On appeal, we review the trial court's decision to admit such evidence for abuse of discretion. *Harp v. Commonwealth*, 266 S.W.3d 813, 922 (Ky. 2008).

With these evidentiary rules in mind, we address Watts's argument that certain evidence was irrelevant and unduly prejudicial.

### 1. References to Drug and Alcohol Use

Several witnesses testified regarding Watts's drug and alcohol use. For example, K.W. testified that Watts had given her and M.W. marijuana at the rec house and that he stored his marijuana in a safe in his closet at the Jenkins Road trailer. M.W. similarly testified that Watts would smoke marijuana with the two girls at the rec house and keep his marijuana in a kitchen cabinet at that residence. She also testified that Watts taught her how to smoke marijuana from a light bulb at the rec house. M.W. also stated that she and Watts would smoke marijuana together at the Jenkins Road trailer prior to having sex. While testifying about the marijuana use, M.W. also volunteered that Watts became a heavy drinker while living at the Jenkins Road trailer, he drank vodka, and he occasionally gave them shots to drink after giving them marijuana. Referring to the marijuana and alcohol use, M.W. continued, "After all that stuff happened, [K.W.] would go to bed, [Watts would] lock the door," and Watts and M.W. would have sex.

Fonda Watts, Watts's mother, also testified about Watts's alcohol use. When asked on cross-examination if Watts had an alcohol problem, she replied

7

that she noticed Watts drinking vodka after his divorce, but she did not consider him an alcoholic. The relevance of this testimony is questionable, as explained below. In addition, during his own testimony, Watts admitted that he gave M.W. marijuana on one occasion, though he denied keeping marijuana in the house on a regular basis. He was also asked during cross-examination if he "had an alcohol problem." He admitted to drinking vodka but denied having an alcohol problem.

As noted above, "[e]vidence of other crimes, wrongs, or acts" may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" or if "inextricably intertwined" with other material evidence. KRE 404(b). We have previously found similar evidence admissible in other child sexual abuse cases. In *Richardson v. Commonwealth*, 161 S.W.3d 327 (Ky. 2005), evidence that the defendant provided cigarettes and alcohol to the minor victim tended to show his modus operandii in controlling the victim. Similarly, in *Gilbert v. Commonwealth*, 838 S.W.2d 376 (Ky. 1991), we held that it was appropriate to introduce evidence that a stepfather provided marijuana and alcohol to his stepdaughters while forcing them to watch sexually explicit movies because it "indicate[d] a pattern of conduct and motive for forcing the young women into adult sexual activity." *Id.* at 379. We explained that "[j]uries do not have to perform their functions of fact-finding in a vacuum." *Id.* Rather, "[i]n order to determine exactly what did or did not happen at any particular stage in the sequence, it was necessary that the jury see the entire

8

picture." *Id.* (quoting *Ware v. Commonwealth*, 537 S.W.2d 174, 179 (Ky. 1976), overruled on other grounds in *Jenkins v. Commonwealth*, 496 S.W.3d 435 (Ky. 2016)) (internal quotation marks omitted); *see also Whaley v. Commonwealth*, 567 S.W.3d 576, 584–85 (Ky. 2019); *Alford v. Commonwealth*, 338 S.W.3d 240, 250 (Ky. 2011).

Here, both victims testified that Watts would give them marijuana prior to sexually abusing them, and M.W. also testified that Watts would sometimes give them shots of alcohol prior to the abuse, as well. This evidence indicates a pattern of conduct in controlling the young victims. It was thus highly relevant and allowed the jury to view "the entire picture" or rather, the entirety of the circumstances leading to the sexual abuse. The highly probative value is not outweighed by any prejudicial affect.

Furthermore, Watts had been charged with second-degree unlawful transaction with a minor, which requires that "he knowingly induce[], assist[], or cause[] a minor to engage in illegal controlled substances activity involving marijuana, illegal gambling activity, or any other criminal activity constituting a felony." KRS 530.065. Watts admitted to providing marijuana to M.W. on one occasion. However, the fact that Watts admitted to one incident does not deprive the Commonwealth of the ability to prove its case, including providing corroborating evidence. *See Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998) ("Generally, . . . the prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see.")

9

(citing *Chumbler v. Commonwealth*, 905 S.W.2d 488, 492 (1995)). Evidence that Watts provided marijuana to M.W. and K.W. on additional occasions than the one for which he was indicted was relevant to demonstrate intent, plan, or absence of mistake or accident. The evidence's probative value for these purposes was not substantially outweighed by its prejudicial effect.

However, the evidence tending to show that Watts himself was a frequent user of drugs or alcohol provided little probative value and was unduly prejudicial. That information was unrelated to the sexual abuse of K.W. and M.W. and thus did not tend to show a common scheme or plan, nor was it necessary for a full presentation of the case. Rather, it tended to show collateral bad acts, namely, substance abuse, in violation of KRE 404. Given the low probative value of this information and its prejudicial effect, it was error to elicit such testimony. *See Chavies v. Commonwealth*, 374 S.W.3d 313, 317–21 (Ky. 2012).

However, Watts did not preserve this error. While no KRE 404(c) notice was provided of the Commonwealth's intent to offer evidence of Watts's substance use,[4] Watts did not object when this evidence was introduced at trial. As a result, Watts failed to preserve this error for ordinary appellate review.

---

[4] The Commonwealth did provide KRE 404(c) notice of its intent to offer evidence that Watts provided alcohol and marijuana to K.W. and M.W. in its Proffer of Testimony Pursuant to 404(b). However, because we found no error in the admission of that evidence, preservation is not an issue.

10

Nevertheless, under Kentucky Rule of Criminal Procedure ("RCr") 10.26, an appellate court may consider "[a] palpable error which affects the substantial rights of a party . . . even though insufficiently raised or preserved for review" and grant relief "upon a determination that manifest injustice has resulted from the error." Thus, to obtain the requested relief, the defendant must be able to show that an error occurred and, as a result of that error, that he or she was substantially prejudiced or was otherwise subjected to manifest injustice. *Parker v. Commonwealth*, 482 S.W.3d 394, 407 (Ky. 2016). However, "[t]he mere possibility of prejudice . . . is not enough." Instead, the defendant must demonstrate "a likelihood—'a reasonable possibility'—that, but for the error, a different sentence would have been imposed." *Id.* at 407–08 (citing *Martin v. Commonwealth*, 409 S.W.3d 340, 349 (Ky. 2013)). The threshold for palpable error is a high one, and the error must be "so egregious that it jumps off the page" and "cries out for relief." *Alford*, 338 S.W.3d at 251 (Cunningham, J., concurring).

On this point, Watts cites to *Chavies* for support. In that case, the defendant's use of marijuana, possession of pornography, and unemployment was completely unrelated to the underlying charges of sexual abuse. It was thus error under KRE 404 to admit that evidence. Several other errors plagued that trial, including improper bolstering of the victim's testimony and gross prosecutorial misconduct. The Court explained,

> To rouse the jury's emotions against the Appellant, the prosecutor, in violation of KRE 404(a) and (b), obsessively focused on attacking his character (through practically every witness) to show that he

was a low-life and a loser—someone who smoked "dope," could not hold a job, relied on his wife to support the family, and enjoyed pornography.

374 S.W.3d at 323. While acknowledging that "the threshold for palpable error is high," the Court found that it could not "ignore the sheer volume of intentional errors in this case meant to prejudice the jury against the Appellant based on his character and not the evidence of the crimes." *Id.*

Unlike the *Chavies* case, however, this case does not involve an "obsessive[] focus[] on attacking his character" that was "meant to prejudice the jury against" Watts. Furthermore, in similar cases involving the improper introduction of collateral bad acts evidence, we have declined to find palpable error where the admissible evidence against the defendant was significant. *See, e.g., Elery v. Commonwealth*, 368 S.W.3d 78 (Ky. 2012). In the present case, the testimony related to Watts's alleged heavy drinking and frequent marijuana use was minimal. He was able to address these allegations during his own testimony, in which he denied having an alcohol problem and denied keeping marijuana in his home. His mother also testified that Watts drank, but he did not have an alcohol problem. In light of all of the evidence presented at trial, including the victims' testimony about the sexual abuse, there is not a reasonable probability that exclusion of this limited testimony would have resulted in a different outcome. Thus, while it was error to introduce evidence of Watts's alleged substance abuse, it was not palpable error warranting reversal under RCr 10.26.

12

## 2. References to Bond and Legal Fees

Fonda Watts, Watts's mother, testified on his behalf at trial. During her testimony, she denied witnessing Watts having sexual intercourse with K.W. Her testimony, therefore, was, at least in part, elicited to rebut K.W.'s allegations. During cross-examination, the Commonwealth, in an apparent attempt to demonstrate the witness's bias, asked Mrs. Watts whether she had "a tendency to take care of things" for Watts. Mrs. Watts replied, "No, he takes care of his own matters." The Commonwealth then asked, "So are you telling the jury that you haven't taken care of him financially?" Mrs. Watts replied, "No, he's been working." The Commonwealth then asked if Mrs. Watts and her husband purchased a home for Watts, which Mrs. Watts confirmed and acknowledged that "okay, yes," she did take care of Watts financially. Later, the Commonwealth asked Mrs. Watts if she paid Watts's bond and legal fees, to which she replied in the affirmative. The Commonwealth then asked again, "So you do have a tendency to want to take care of things for your son?" Mrs. Watts replied, "For all my family."

Watts now argues that the questions related to his bond and legal fees were irrelevant and allowed the jury to infer that Watts had been incarcerated prior to trial, thereby undermining the presumption of innocence. The Commonwealth, on the other hand, argues that this line of questioning was relevant to attack the credibility of Fonda Watts.

We agree that this line of questioning was relevant for impeachment purposes and not unduly prejudicial. KRE 607 allows any party to attack the

credibility of a witness. Accordingly, a party may question a witness on his or her bias, interest, or hostility, including the witness's relationships and personal and monetary interests in the outcome of the case, among other things.[5] In the present case, Fonda Watts denied "taking care of" matters for her son, which would have shown her bias towards her son, and denied providing him with financial assistance. The Commonwealth then asked about various ways that Mrs. Watts *had* provided assistance to Watts, including purchasing a home and paying for his bond and legal fees. After eliciting this information, the Commonwealth again asked Mrs. Watts if she had "a tendency to want to take care of things" for Watts, and Mrs. Watts admitted that she did, in fact, have a tendency to take care of things for her family, including her children. Thus, the Commonwealth used this line of questioning to challenge Mrs. Watts's own statement that she did not "take care of things" for her son. We therefore conclude that this evidence was relevant for impeachment purposes, and this relevance was not outweighed by any prejudicial effect.

Watts further argues that questions related to his bond and legal fees allowed the jury to infer that he had been incarcerated prior to trial, thereby undermining the presumption of innocence. We find this argument unpersuasive. No testimony was elicited specifically as to Watts's incarceration or length thereof. Detective Fields had already testified that Watts had been arrested for unlawful transaction with a minor. Evidence that Watts's bond had

---

[5] *See* ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.10 (5th ed. 2013).

been paid implied that he was not currently incarcerated. This evidence, as presented in this case, did not erode Watts's presumption of innocence.

### 3. Testimony Regarding K.W.'s Missing Cell Phone and Journals

As noted above, K.W. kept several journals and a cell phone, but she was removed from Watts's home before she could retrieve these items. Prior to trial, Watts made a motion in limine to exclude any reference to the cell phone recordings but did not request that evidence of the journals be excluded. The trial court granted Watts's motion, prohibiting the Commonwealth from referencing the cell phone recordings during its case-in-chief. The Commonwealth abided by this order and further chose not to mention the journals during its case-in-chief. However, defense counsel raised both of these issues several times during cross-examination of the Commonwealth's witnesses. For example, defense counsel elicited testimony about these items from K.W. during cross-examination, even introducing some of the journal entries into evidence. Defense counsel stated that the journal entries were relevant because K.W. used the journals to express her feelings and recount things that had happened to her but did not write about her father sexually abusing her.

Detective Fields later testified for the Commonwealth about his decision not to search the home based on Watts's statements that the children's belongings and mattress had already been removed. During cross-examination and re-cross of Detective Fields, defense counsel repeatedly challenged him about this decision. Defense counsel also presented Detective Fields with some

15

of the journal entries, and Detective Fields responded that he would like to see "the full journals." Defense counsel eventually followed up by saying, "You say you'd like to see them but, again, I guess you're just operating on the theory that they've been destroyed along with the mattresses." Detective Fields responded, "I think you all have got more information than we do." Defense counsel then said, "Well, I don't know if that's true or not" and ended his questioning of Detective Fields. Watts later testified that he found the journal pages while looking for the cell phone but did not read them before he gave them to his attorney, as he could not read. He further testified that he did not destroy any journals or the cell phone; rather, he had boxed up all of K.W.'s belongings before he moved and did not know where the cell phone was.

During closing arguments, the Commonwealth referenced the missing journals and cell phone, noting that Watts failed to produce these items. The prosecutor stated, "It's got to make you think, why don't we have all of them and why don't we have the phone? Why? He's the one that can produce them, that's where they were left, at his residence." Defense counsel did not object.

Watts now argues that the testimony of Detective Fields and the argument of the Commonwealth violates KRE 404 and improperly shifted the burden to Watts to produce the cell phone and journals. We disagree. First, it must be noted that the Commonwealth abided by the trial court's order and refrained from referencing the cell phone and journals during its case-in-chief. These matters were raised *by the defense* during cross-examination of K.W. and Detective Fields. In fact, the comment that Watts finds so troubling—

16

namely, Detective Fields's statement, "I think you all have got more information than we do"—was in response to defense counsel's own suggestion that Detective Fields was "operating on the theory that [the journals had] been destroyed along with the mattresses." Defense counsel, then, is the one who initially suggested that the evidence had been destroyed. Detective Fields was merely responding to that suggestion.

Furthermore, the Commonwealth's statements during closing argument did not improperly shift the burden to Watts. To be clear, Watts, as the defendant, was never under any duty to produce the cell phone or journals. Statements by the Commonwealth suggesting that he should have produced these items were inartful at best, and we strongly caution the Commonwealth to refrain from making similar statements in the future which could suggest an improper burden shifting. However, in these limited circumstances, the statements did not improperly shift the burden to the defendant. The Commonwealth's statements were in response to defense counsel's attack on Detective Fields's decision not to seek a search warrant. *See Montgomery v. Commonwealth*, 346 S.W.2d 479, 482 (Ky. 1961) ("It seems to us apparent that when the questionable statements of the prosecuting attorney, with their attendant circumstances, are considered, they were provoked by and made in response to previous statements of the defendant's attorney before the jury."). Accordingly, we find no error in the admission of these statements.[6]

---

[6] Watts also argues that "the Commonwealth's position that Watts had either hid [sic] or destroyed the journals and cell phone, were essentially allegations Watts tampered with physical evidence, a crime that Watts was never charged with." Having

17

## B. Right to Present a Complete Defense

Under both the United States Constitution and the Kentucky Constitution, a defendant has a right to "a meaningful opportunity to present a complete defense." *Montgomery v. Commonwealth*, 320 S.W.3d 28, 41 (Ky. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). This includes the right to testify on his own behalf and the right to cross-examine witnesses. *Id.* (citations omitted). However, the right to present a complete defense must be balanced

> against both the wide latitude trial judges retain to "impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," and the broad latitude state rule makers have "to establish rules excluding evidence from criminal trials."

*Id.* (citations omitted); *see also McPherson v. Commonwealth*, 360 S.W.3d 207 (Ky. 2012) (explaining that a "defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or disproportionate to the state's legitimate interest must the rule bow to the defendant's right") (citation omitted).

In the present case, Watts claims that his inability to introduce certain evidence and his limited cross-examination of K.W. deprived him of a

---

reviewed the record, we do not believe that the Commonwealth implicated Watts in the crime of tampering with physical evidence. As noted above, the Commonwealth's comments were in response to the defense attorney's own comments about the destruction of the cell phone and journals. Therefore, we acknowledge but reject this argument.

18

meaningful opportunity to defend his case. We address each of these concerns in turn.

## 1. Evidence of Victims' Discussion About a Sex Toy

Watts first argues that he was denied the "meaningful opportunity to present a complete defense" because he was unable to introduce evidence that K.W. and M.W. had discussed using a sex toy. He acknowledges that, under KRE 412(a), "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" is generally inadmissible "in any civil or criminal proceeding involving alleged sexual misconduct." However, the rule allows for certain exceptions in criminal cases. For example, a criminal defendant may introduce "evidence of specific instances of sexual behavior by the alleged victim [if] offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence." KRE 412(b)(1)(A).

To introduce such evidence, the requesting party must follow the procedure outlined in KRE 412(c). This requires the requesting party to "file a written motion at least fourteen (14) days before trial . . . unless the court, for good cause requires a different time for filing or permits filing during trial." KRE 412(c). When a party seeks to file this motion outside of the fourteen-day deadline, it is within the trial court's discretion to determine whether the "good cause" element has been satisfied.

On the second day of trial, Watts's counsel notified the court of his intent to introduce evidence that K.W. shared a sex toy with M.W. He argued that the Commonwealth had "opened the door" to this evidence because one of its

witnesses, Dr. Calhoun, would testify that day to the existence of a tear in K.W.'s hymen. K.W. had testified on the first day of trial that she had not had sex with anyone other than Watts. Thus, according to defense counsel, this evidence proves that the tear in K.W.'s hymen could have been caused by something other than intercourse with Watts. Defense counsel conceded, however, that his notice was untimely under KRE 412(c)(1)(A). He provided no explanation for the late notice, although it appears as though it was a strategy employed to prevent the Commonwealth from knowing the details of his theory of defense. The trial court ultimately prohibited introduction of this evidence, explaining that it would violate the "intent if not the black letter of KRE 412" to introduce this evidence when Watts had failed to satisfy the rule's notice requirements.

As noted above, it is within the trial court's discretion to determine whether the movant's explanation qualifies as good cause. Here, defense counsel had access to K.W.'s medical records (including a "report that said there was a tear in her hymen"), the Facebook messages, and other discovery materials for several months prior to trial. Therefore, defense counsel could have timely complied with KRE 412's notice requirements in anticipation of Dr. Calhoun's testimony, yet he waited until the second day of trial to notify the court of its intention to use this evidence. Defense counsel did not provide an excuse for failing to do so. Under these circumstances, we cannot hold that the trial court abused its discretion in prohibiting the introduction of this evidence.

20

## 2. Evidence of M.W.'s Sexually Transmitted Disease

Watts also argues that he was denied an opportunity to present a complete defense because the trial court denied his KRE 412[7] motion to introduce evidence of M.W.'s sexually transmitted disease. More specifically, on the first day of trial, May 29, 2018, Watts's counsel sought to introduce evidence that M.W. had been diagnosed with chlamydia while Watts had tested negative for any STDs. The Commonwealth objected on the basis that the motion was untimely. The Commonwealth pointed out that the court heard argument on the Commonwealth's motion to preclude evidence of M.W.'s sexual history on May 7, 2018 and evidence of her chlamydia was never discussed. The trial court ultimately denied Watts's motion but allowed defense counsel to ask M.W. about her chlamydia diagnosis by avowal.

We again note that it remains within the trial court's discretion to determine whether the good cause element of KRE 412(c)(1)(A) has been satisfied. In this case, Watts's counsel did not fully explain why he failed to raise the issue during the May 7, 2018 hearing on the Commonwealth's motion. He stated that he was filing the notice because the cases had been joined for trial and the Commonwealth's own proffer of evidence "change[d] things a little bit." He did not elaborate further. However, the proffer was provided by the Commonwealth on May 11, 2018, and the trial court granted

---

[7] While it is not entirely clear that evidence of M.W.'s STD (coupled with Watts's lack of any STD) falls squarely within the scope of KRE 412, this is the rule cited by the defense and relied upon by the parties during their arguments to the trial court and in their briefs to this Court.

21

the Commonwealth's motion to join the cases for trial on May 22, 2018. While defense counsel stated, and both the Commonwealth and trial court acknowledged, that he filed the notice immediately after the court entered its May 22, 2018 order, the record contains no such filing. We cannot find that the trial court abused its discretion in denying Watts's untimely motion.

### 3. Limited Cross-Examination of K.W.

Watts also argues that he was unable to present a complete defense because the trial court limited his ability to cross-examine K.W. under KRE 611. KRE 611(b) states, in full, "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interests of justice, the trial court may limit cross-examination with respect to matters not testified to on direct examination." We have previously explained, "Whenever limitations on the right of cross-examination are analyzed, it should be remembered that the right implicated is a fundamental constitutional right and that such limitations should be cautiously applied . . . . However, it should also be noted that trial courts retain broad discretion to regulate cross-examination." *Commonwealth v. Maddox*, 955 S.W.2d 718, 720–21 (Ky. 1997) (citations omitted). Thus, "[s]o long as a reasonably complete picture of the witness' [sic] veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Id.* at 721 (quoting *U.S. v. Boylan*, 898 F.2d 230, 254 (1st Cir.1990)) (internal quotation marks omitted).

In the present case, K.W. was asked during direct examination if she had ever had sex with anyone besides Watts. She replied in the negative but

22

explained that she once had a sexual encounter with her cousin, who had attempted to "push himself on to" her. She explained that she only had oral sex with this cousin. On cross, Watts's counsel asked K.W. if she had received counseling as a result of the incident with her cousin. The Commonwealth objected as to relevance. Watts's counsel explained that the counseling sessions had given K.W. an opportunity to disclose the abuse. During her testimony, however, she had stated that she was scared of her father, which, defense counsel argued, implied that she could not tell anyone. Defense counsel also questioned "what sort of, essentially, maniac would take somebody that they are raping to a rape counselor." The trial court sustained the Commonwealth's objection but permitted defense counsel to ask if Watts dropped K.W. off at her counseling sessions. Watts now argues that he was denied the right to present his defense because his cross-examination of K.W. was limited in scope.

Essentially, then, Watts argues that the trial judge abused his discretion in restricting defense counsel's cross-examination of K.W. We disagree. While Watts's counsel could not inquire into the substance of the counseling sessions, he was able to cross-examine K.W. about the fact that her father dropped her off at Four Rivers Behavioral Health to "see someone." This was the very information that defense counsel claimed to be relevant. He also stressed these facts during closing arguments. We therefore fail to see how Watts's right to present a defense was impeded by the reasonable limitation placed on the cross-examination of K.W.

23

## C. Prior Conviction Evidence

KRS 532.055(2) allows the Commonwealth to offer evidence "relevant to sentencing," including, among other things, information related to prior offenses. For example, the Commonwealth can introduce evidence of "[t]he nature of prior offenses for which [the defendant] was convicted." However, in *Robinson v. Commonwealth*, 926 S.W.2d 853 (Ky. 1996), we explained "all that is admissible as to the nature of a prior conviction is a general description of the crime." *Id.* at 855. We later clarified this rule in *Mullikan v. Commonwealth*, 341 S.W.3d 99 (Ky. 2011), holding that "the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed." *Id.* at 109. We also warned that "[t]he trial court should avoid identifiers, such as naming of victims, which might trigger memories of jurors who may—especially in rural areas—have prior knowledge about the crimes." *Id.* Thus, *Mullikan* made clear that the Commonwealth should not identify the victims of a defendant's prior crimes when introducing prior conviction evidence.

In the present case, the Commonwealth submitted certified copies of Watts's prior convictions during the sentencing phase of Watts's trial. A probation and parole officer testified and read from these documents, reciting the location and date of the convictions, the case numbers, and the specific charges and sentence for each conviction. She did not read the names of any of the victims to the jury. However, on one of these documents, which was related to Watts's 1998 conviction for theft by unlawful taking, the victim's

24

name had not been redacted. The unredacted document was entered into evidence and provided to the jury during deliberations. Watts did not object at the time, but now argues that the victim's name was inadmissible under KRS 532.055 and the above-cited case law.[8]

Having reviewed the certified conviction exhibit at issue, we conclude that the victim's name was improperly included, and the Commonwealth acknowledges that inclusion of the victim's name was error. However, defense counsel did not object to the introduction of this exhibit, and as a result, we review this error for palpable error under RCr 10.26.[9] We have previously held that similar prior conviction errors fail to warrant relief under RCr 10.26 when the prosecutor makes no reference to the inadmissible evidence during questioning or argument and the defendant's sentence is otherwise "readily and reasonably accounted for by properly admitted evidence." *Parker*, 482 S.W.3d at 407; *see also Martin*, 409 S.W.3d at 349.

Here, even if we presume that the jury examined the prior conviction exhibits and noticed the victim's name, we have no reason to believe that this influenced their sentencing recommendation. First, the prosecutor did not elicit any testimony about the victim or otherwise identify that victim during questioning or closing argument. Furthermore, the circumstances of this

---

[8] The prior conviction exhibit at issue also improperly listed a dismissed charge for terroristic threatening, with the victim of that charge also listed. However, that particular defect was not raised on appeal.

[9] In general, counsel for both the Commonwealth and defense should carefully review such exhibits for similar errors prior to their admission into evidence.

case—which involve the rape and sexual abuse of Watts's biological child and her young friend—strongly suggest that Watts's sentence resulted from the nature of these crimes, rather than the jury's awareness of the victim's name in the prior theft by unlawful taking conviction.

Simply put, Watts has failed to demonstrate "a likelihood—'a reasonable possibility'—that, but for the error, a different sentence would have been imposed." *Parker*, 482 S.W.3d at 407–08 (citing *Martin*, 409 S.W.3d at 349). Accordingly, while it was error to include the victim's name on the prior conviction exhibit, Watts did not suffer the substantial prejudice or manifest injustice necessary to warrant relief under RCr 10.26.

### D. Cumulative Error

If no single error warrants relief, Watts argues that the errors, taken as a whole, warrant reversal under the cumulative error doctrine. Under this doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). However, "[w]e have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992)). In cases where "none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth*, 95 S.W.3d 34 (Ky.2002)).

26

In this case, we have identified two errors, both unpreserved, and concluded that neither warrants relief under RCr 10.26. As explained above, any prejudicial effect of these errors was minimal, at most. Thus, these two errors, either individually or cumulatively, do not render Watts's trial fundamentally unfair. Accordingly, the doctrine of cumulative error does not warrant reversal in this case.

## III.    CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Lyon Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Adam Meyer
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Mark Barry
Assistant Attorney General

27