# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 25, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0591-MR

TRAVIS DURRUM                                              APPELLANT


ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.            HONORABLE THOMAS D. WINGATE, JUDGE
NO. 18-CR-00266


COMMONWEALTH OF KENTUCKY                         APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Travis Durrum was convicted of one count of first-degree criminal abuse, one count of first-degree rape, one count of first-degree sexual abuse, and two counts of first-degree sodomy, of a victim under twelve (12) years of age. The jury recommended a sentence of eighty (80) years, which the trial court appropriately reduced to seventy (70) years, the maximum permitted under Kentucky Revised Statute (KRS) 532.110. This appeal followed as a matter of right.[1] Having reviewed the record and the arguments of the parties, we affirm the judgment of the Franklin Circuit Court.

---

[1] *See* KY. CONST. § 110(2)(b).

## I. BACKGROUND

This case rests principally on the credibility and testimony of two individuals, the victim M.S. [2] and the defendant Travis Durrum (Travis). In order to adequately understand, and analyze for possible misconduct, the Commonwealth's cross-examination of Travis and closing arguments, it is necessary to summarize in some detail the trial testimony of all seven witnesses.

Travis and his wife Juanita Durrum (Juanita) served as guardians for the victim, M.S. In July 2016, M.S.'s biological mother was in drug rehabilitation, and prior to her residing with the Durrums, M.S. was being cared for by her maternal grandmother. The grandmother would take M.S. to see her mother, which was not permitted. Juanita was related to M.S., and M.S. was put in the custody of Travis and Juanita in late July or early August 2016. M.S. was seven years old when she began living with the Durrums. The record, including M.S.'s testimony, is unclear as to the actual familial relationship between Juanita and M.S. In her testimony, M.S. stated she thought Juanita was her "great-aunt's sister."

During M.S.'s time with the Durrums, they resided at three locations. Initially, they lived in a small apartment in Lawrenceburg in Anderson County. In November 2016, the family moved to a townhouse in Franklin County and in March 2017, to an apartment in Franklin County. In addition to M.S. and the

---

[2] To preserve the privacy of the minor victim, we will refer to her by her initials.

Durrums, Travis's sister Nicole, Nicole's boyfriend, and their children lived with them in the townhouse location. When they moved to the Franklin County apartment, Nicole and her family occupied an apartment across the hall.

This arrangement lasted until November 2017, when M.S. was removed from Travis and Juanita's custody by the Cabinet for Health and Family Services (CHFS) and placed with a foster family. Approximately one month after her placement, M.S. disclosed to her foster mother, Tiffany Parsons, that Travis had sexually abused her. The charged events are all alleged to have occurred in either the townhouse or apartment in Franklin County between October 2016 and November 2017.

At trial, the Commonwealth called four witnesses: CHFS social service investigator, Craig Gonzales; Tiffany Parsons; forensic pediatrician, Dr. Sugarman; and M.S. herself. Gonzales testified that upon receiving Parsons's report, he initiated an investigation and attempted to contact Travis at least four times. Travis refused any interview without an attorney. During visits to the Durrums' residence, Gonzales only spoke with Juanita. Gonzales stated that as he arrived during one of the contact attempts, he saw a male, whom he later recognized as Travis, throwing away a twin mattress. Gonzales further testified that M.S. indicated to him that there was a second child involved with the events. On cross-examination, Gonzales stated he was never able to substantiate the presence of or events regarding a second child.

Tiffany Parsons's testimony was limited. Parsons described the events surrounding M.S.'s first disclosure of the abuse, approximately a month after

3

coming to Parsons's home. Parsons stated that upon being told of the abuse, she immediately contacted CHFS. Parsons also testified to M.S.'s good performance in school and M.S.'s concerns over others learning of her abuse. Parsons indicated M.S. became upset on occasion when she thought other people knew of what happened or were talking about her.

Dr. Sugarman's testimony related to the forensic examination she performed on M.S. Dr. Sugarman testified that this examination was "normal," but that a normal examination is not indicative of whether a specific event or series of events did or did not occur. Dr. Sugarman testified that the areas of the human body involved heal rapidly, and it had been a substantial period between the last contact between M.S. and Travis and the examination. At one point, the Commonwealth sought Dr. Sugarman's opinion on whether M.S. was telling the truth, the question was objected to, and the trial court sustained the objection. A copy of Dr. Sugarman's report was entered into evidence, with the portions concerning M.S.'s description of events redacted.

M.S. testified that Travis tried to initiate both vaginal and anal sex on more than one occasion. At the time of her testimony, M.S. was ten years old and testifying to abuse that began when she was seven years old and continued until she was eight. M.S. stated that Travis forced her to perform oral sex and that the abuse would occur after Travis arrived home from work if Juanita was not there. On cross-examination, defense counsel questioned M.S.'s veracity, calling into question the discrepancy between her original statements to authorities that "it happened almost every day" to her current

4

statement that "it happened whenever he got a chance." Defense counsel also elicited statements from M.S. that Travis never moved out of the home prior to her removal in November 2017.

Travis called two witnesses and testified on his own behalf in efforts to rebut elements of M.S.'s testimony. Travis's sister Nicole and her family lived with the Durrums in the townhouse location and across the hall at the apartment location. Nicole testified that in her experience, Travis was never alone with M.S., but on cross-examination, she admitted she was not with them all the time so could not be certain they were never alone. Nicole further stated the two households effectively operated as one, with people coming and going without knocking. Nicole also testified that Travis separated from Juanita in August 2017 and never moved back into the home. During cross-examination, the Commonwealth also questioned Nicole regarding Travis's use of the last name "Durrum," with Nicole admitting that Travis took Juanita's last name when they married. Travis's mother, Sandra, also testified to the separation, though she was less specific as to the actual month Travis moved out and could not state that he never returned to the home to visit.

Travis took the stand to testify in his own defense. His defense was principally based on an assertion that he never had an opportunity to commit the acts described by M.S. He testified that during the period in question, he worked for a manufacturer in Shelbyville, often working both day and night shifts and purporting to have an hour-and-a-half commute each way. Travis also stated that he was never alone with M.S., that he never had any sexual

5

contact with M.S., and that M.S. never confronted him regarding his alleged behavior. Travis testified he moved out of the apartment during the second week of August 2017 after a fight with Juanita and never moved back into the apartment.

On cross-examination, the Commonwealth took issue with Travis's statement that his commute was an hour and a half to travel twenty-six miles of Interstate 64 to get to and from his job. They further questioned Travis's assertion that he worked extreme hours, emphasizing that Travis failed to introduce any corroborating evidence as to this work schedule, despite the fact such evidence should be easily available. The Commonwealth then began a series of questions relating to Travis and Juanita's relationship, specifically their marital fidelity. Specifically, the Commonwealth began by asking Travis if Juanita became pregnant after separating from Travis. Defense counsel objected to this question as irrelevant. The Commonwealth then rephrased the question to ask whether Juanita was having an affair during their marriage. In response, Travis stated it was not an affair, as they had an "open marriage." Travis's admission elicited a noise by the Commonwealth's Attorney, which Travis argues was "Eww" while the Commonwealth argues was "Ooh." The Commonwealth's Attorney then said, "I understand that's kind of outside the normal bounds of morality." The defense objected, and the Commonwealth appended an "[I]sn't it?" in an attempt to turn the statement into a question. The court directed the statement/question to be stricken and for the Commonwealth to "move on to something else." Despite the court's direction,

6

the Commonwealth continued to question Travis on the morality of his lifestyle, effectively forcing Travis to comment on his own morality. Defense counsel did not object to this continued questioning. The Commonwealth then asked follow-up questions regarding Travis's other girlfriends and relationships, facts that Travis had testified to on direct.

In closing argument, defense counsel emphasized the discrepancy between M.S.'s statement that "it happened almost every day" and that the abuse occurred after work between five and six in the evening. The defense characterized this time frame as unlikely due to usually high activity in the home at that time, and therefore the chance of discovery was high. The defense left the jury with the question, "could it have happened almost every day without someone finding out?"

The Commonwealth, in closing, made a number of statements supporting M.S.'s credibility. The Commonwealth emphasized that the defendant's only argument was that M.S. was making up all of the events. The Commonwealth supported M.S.'s testimony by directing the jury to Tiffany Parsons's testimony as to M.S.'s concern over others knowing of the events, Craig Gonzales's witnessing Travis disposing of a twin mattress, and a lack of apparent motive by M.S. to fabricate her story. The Commonwealth further stated, "[y]ou have a little girl who's 100% believable, and 100% credible...There wasn't a thing that came out of her mouth that wasn't true...I never saw a face like that before....the most credible witness I ever saw. Everything she told you was true." The Commonwealth emphasized that point by referring back to portions

of Dr. Sugarman's testimony which described the language and terms victims M.S.'s age use when describing such events.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Travis asserts there was flagrant prosecutorial misconduct during the Commonwealth's cross-examination of Travis and in the Commonwealth's closing argument warranting reversal of his convictions. Additionally, Travis argues the court's failure to renumber the counts after dismissing count one is reversible, palpable error.

### A. Prosecutorial misconduct

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'"[3] One way in which the misconduct can occur is through an improper closing argument.[4] Any allegation of misconduct must be viewed in the context of the overall fairness of the trial.[5] To justify reversal, the Commonwealth's misconduct must be "so serious as to render the entire trial fundamentally unfair."[6]

---

[3] *Commonwealth v. McGorman*, 489 S.W.3d 731, 741–42 (Ky. 2016) (quoting *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011)).

[4] *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (citing *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)).

[5] *McGorman*, 489 S.W.3d at 742 (citing *St. Clair v. Commonwealth*, 451 S.W.3d 597, 640 (Ky. 2014)).

[6] *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001)).

8

"If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury."[7] However, if no objection is made, the Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair."[8]

> In considering an allegation of prosecutorial misconduct in closing argument, the Court considers the arguments as a whole while remembering that counsel is granted wide latitude during closing argument. The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom.[9]

To determine whether a prosecutor's comments amount to flagrant misconduct, we utilize a four-part test. The four factors to be considered are: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.[10]

1. **During cross-examination, the question of whether Travis and Juanita's open marriage was "kind of outside the normal bounds of morality" was improper.**

---

[7] *Duncan*, 322 S.W.3d at 87 (citing *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002); *Partin v. Commonwealth*, 918 S.W.2d 219 (Ky. 1996)).

[8] *Id.*

[9] *Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017) (internal citations and quotation marks omitted).

[10] *Id.* at 54 (internal citations and quotation marks omitted). *See also Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020).

Travis alleges multiple errors during his cross-examination by the Commonwealth. First, he alleges prosecutorial misconduct by the Commonwealth's Attorney's failure to "move on" as directed by the court in response to the defense's objection to the question of whether an open marriage was "outside the normal bounds of morality." Second, he argues that the trial court erred in admitting Travis's testimony regarding Juanita's infidelity, the couple's open marriage, and Travis's girlfriends. Third, he alleges prosecutorial misconduct in the form of the Commonwealth's utterance of "Eww" or "Ooh" in response to Travis's acknowledgement that he and Juanita had an open marriage. None of these alleged errors are properly preserved.

During the Commonwealth's Attorney's cross-examination of Travis, the Commonwealth asked Travis whether he was the father of the child Juanita was carrying when the Commonwealth's Attorney first met her. This meeting took place in the summer of 2018, almost a year after Travis and Juanita's separation. Defense counsel objected, arguing the question was irrelevant. The court overruled the objection to the extent the question pertained to the relevant period of the indictment. The Commonwealth rephrased the question to ask whether there was an ongoing affair during the period of time at issue in the indictment. This exchange elicited an answer from Travis that they had an "open marriage" and led the Commonwealth Attorney to utter either "Eww" or "Ooh" and to comment, "I understand that's kind of outside the normal bounds of morality." Defense counsel objected to the latter, and the Commonwealth amended the statement with "Isn't it?"

10

The court ordered the Commonwealth's comment/question stricken and directed the Commonwealth to "move on to something else[,]" implicitly sustaining the defense counsel's objection not just to the form of the question but also to the content of the question. Despite the admonition, the Commonwealth continued with this line of questioning, resulting in Travis stating an open marriage was not outside the bounds of normal morality "in light of modern society." He also readdressed the fact that he had several girlfriends after the separation from Juanita. Notably, the Commonwealth's continued questioning in this vein generated no additional objection from defense counsel or comments from the court.

The first issue is whether the Commonwealth's Attorney committed prosecutorial misconduct by failing to "move on" as the trial court directed. Defense counsel's objection to the form of the Commonwealth's question regarding whether an open marriage was "outside the normal bounds of morality" was sustained and the statement was stricken. This is precisely the relief sought by the defense, and he requested no further relief. "It is well within the realm of valid assumption that counsel was satisfied with the court's admonition to the jury."[11] But the court in sustaining defense's objection, ordered more than the comment be stricken. The trial court ordered the Commonwealth's Attorney to "move on to something else." Despite this

---

[11] *West v. Commonwealth*, 780 S.W.2d 600, 602 (Ky. 1989) (quoting *Hunter v. Commonwealth*, 479 S.W.2d 4, 6 (Ky. 1972)); *see also Rine v. Commonwealth,* No. 2002-SC-1079-MR, 2005 WL 1185205, at *6 (Ky. May 19, 2005) ("We must assume that defense counsel was satisfied with the relief granted.").

11

direction, the Commonwealth continued to pursue the question, eventually forcing Travis to comment generally on his own morality. We find such conduct to be obviously improper, as the defendant's own personal view of the morality of a particular lifestyle is irrelevant as to the question of guilt of the specific charges and the trial court clearly ordered the Commonwealth to "move on." We acknowledge the Commonwealth was entitled to explore Travis's conduct,[12] but we do not believe such entitlement extends to forcing Travis to opine on the relative morality of that conduct or to do so against the trial court's directive. Despite the improper question, defense counsel did not object to the rephrased question; therefore, we review for palpable error. In doing so, we must determine if the Commonwealth's Attorney committed flagrant prosecutorial misconduct.

We hold the improper question represented flagrant prosecutorial misconduct. The question prejudiced Travis in requiring he respond with an assessment of his own personal morality. The question, while short in duration, was a focus of the Commonwealth's cross-examination. The improper question was deliberately placed before the jury by the Commonwealth and the Commonwealth was admonished to "move on." We find the Commonwealth's Attorney's failure to move on as directed particularly troublesome.

Finally, we must evaluate the strength of the case against Travis. M.S.'s testimony was supported by the testimony of other witnesses. Craig Gonzales

---

[12] *Smith v. Commonwealth*, 904 S.W.2d 220 (Ky. 1995) (Stigmatization alone is not grounds for exclusion of relevant evidence.).

12

witnessed Travis throwing away a twin mattress before a home visit just days after M.S.'s initial disclosure. M.S. also testified at trial that she slept on a twin mattress. Dr. Sugarman's description of how a child of M.S.'s age would likely express events of the type alleged to have been committed by Travis was consistent with M.S.'s testimony. There were no allegations or evidence of coaching. The defense never alleged a motive on M.S.'s part to fabricate the events. Lastly, the initial disclosure was made to a temporary foster parent with no relationship, or apparent animus, to the parties.

The Commonwealth ably and properly called into question Travis's credibility and impeached Travis's basic contention that he never had an opportunity to commit the acts described by M.S. His testimony regarding unrealistic commute times, extreme hours, and the assertion he was never alone with M.S. were all reasonably questioned. In addition, as outlined above, the Commonwealth supported M.S.'s version of the events with testimony from other witnesses. In balancing the four factors, the final factor weighs heavily for the Commonwealth, but the prior factors all weigh in Travis's favor. We hold the Commonwealth's Attorney's improper question was flagrant misconduct, but we defer considering whether the misconduct rendered his trial fundamentally unfair until we have evaluated the closing arguments.

The second question surrounds the Commonwealth's Attorney's line of questioning regarding Travis and Juanita's "open marriage" and Travis's testimony as to his other girlfriends. With the exception of the previously discussed morality component, defense counsel did not object to these

questions. Therefore, any possible error is unpreserved, and we review for palpable error under Kentucky Rule of Criminal Procedure ("RCr") 10.26. RCr 10.26 allows this Court to review an unpreserved error if it is palpable, affects the substantial rights of a party, and results in manifest injustice. To determine if an error is palpable, "an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different."[13] To be palpable, the error must be "easily perceptible, plain, obvious and readily noticeable."[14] A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings.[15] "It should be so egregious that it jumps off the page...and cries out for relief."[16]

We start by noting a trial court's administration of the scope of cross-examination is within its sound discretion[17] and will only be disturbed if "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[18] Furthermore, we note that unlike the prior question, the Commonwealth's follow-up questions related to concrete events and facts *the defense introduced on direct examination.* On direct, Travis volunteered that he and Juanita were

---

[13] *Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky. 1983).

[14] *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997) (citing BLACK'S LAW DICTIONARY (6th ed. 1995)), *abrogated on other grounds by Nami Res. Co., L.L.C. v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323 (Ky. 2018).

[15] *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky. 2005).

[16] *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012) (quoting *Alford v. Commonwealth*, 338 S.W.3d 240, 251 (Ky. 2011) (Cunningham, J., concurring)).

[17] *Baze v. Commonwealth*, 965 S.W.2d 817, 821 (Ky. 1997) (citing *Moore v. Commonwealth*, 771 S.W.2d 34 (Ky. 1988)).

[18] *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

in an open marriage and that he had girlfriends in Lexington after he and Juanita separated. As such, the prosecution is entitled to cross-examine Travis as to those statements, and there was no error in permitting the questions.[19]

Lastly, we do not view the Commonwealth's Attorney's utterance of "Eww" or "Ooh" to represent prosecutorial misconduct. Applying the four-factor test, the first weighs weakly in favor of the defendant. The utterance did not weigh on the evidence but may have had a slight prejudice to the defendant. Conversely, the second and third factors weigh heavily in favor of the Commonwealth. The statement was isolated, a single and brief utterance. After reviewing the record, it is unclear to us whether the utterance was intentionally or accidently placed before the jury. As previously addressed, the fourth factor weighs in favor of the Commonwealth. With three of the four factors weighing in favor of the Commonwealth, the prosecutor's utterance does not rise to the level of flagrant prosecutorial misconduct.

## 2. During closing argument, the Commonwealth committed flagrant prosecutorial misconduct, but such misconduct did not render Durrum's trial, as a whole, fundamentally unfair.

Travis asserts the Commonwealth's Attorney's closing argument was "replete with improper vouching of M.S.'s credibility." Specifically, Travis contends the trial court permitted flagrant prosecutorial misconduct by not

---

[19] *See, e.g., Kiper v. Commonwealth*, 399 S.W.3d 736, 749 (Ky. 2012) (stating the Commonwealth is entitled to make reasonable arguments in response to matter brought up by defendant); *Sanders v. Commonwealth*, 801 S.W.2d 665, 677 (Ky. 1990) (prosecutor's questions regarding defendant's violent actions towards wife and confrontation with the ex-husband were in response to statements made by defendant on direct).

addressing the following Commonwealth's Attorney's comments: (1) "I know you believe this child"; (2) M.S. was "one-hundred percent believable"; and (3) "there wasn't a thing that came out of her mouth that wasn't true…it's the most credible witness I ever saw; everything she told you was true." In addition to the statements regarding M.S.'s credibility, Travis argues the Commonwealth's Attorney's factual misstatement of when Travis changed his last name unfairly implicated Travis's credibility. Prosecutorial misconduct is viewed in the context of the overall fairness of the trial.[20] Travis's argument was not preserved by a contemporaneous objection; therefore, reversal is warranted only if the misconduct was flagrant and the misconduct rendered the trial fundamentally unfair.[21]

"Closing arguments are not evidence, and prosecutors are given 'wide latitude' during closing arguments."[22] Even with wide latitude, neither the prosecution nor the defense may "interject[] their personal beliefs in the presentation of his case."[23] While not expressing a personal belief, both the prosecution and defense can comment on the credibility of witnesses in closing, so long as such comments are drawn from the evidence presented or

---

[20] *Murphy*, 509 S.W.3d at 49 (citing *McGorman*, 489 S.W.3d at 574).

[21] *Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky. 2006) (quoting *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002)).

[22] *Hall v. Commonwealth*, 551 S.W.3d 7, 17 (Ky. 2018) (citing *Stopher*, 57 S.W.3d at 805-06); *see also Murphy*, 509 S.W.3d at 50.

[23] *U.S. v. Young*, 470 U.S. 1, 8-9 (1985).

reasonable inferences from such evidence.[24] Counsel may respond in closing to arguments calling into question or supporting the veracity of a witness's statements,[25] but such comments by counsel may not extend to *personally vouching* for the credibility of any particular witness.[26]

The lack of physical evidence herein resulted in a case that came down to a jury determination of the credibility of M.S., Travis, and their respective supporting witnesses. In its closing, the defense focused on whether M.S.'s rendition of events was believable. Defense counsel called into question M.S.'s revision of the events' frequency from "every day" to "whenever [Travis] had the chance." Defense counsel also argued M.S.'s timing of the events, after work, during the dinner hour, was particularly suspect and that common sense said it really could not happen this way without someone finding out. The defense also emphasized that both Nicole and Sandra testified to Travis's lack of opportunity given his stated work schedule, the fact "he was never alone with M.S.," and that contrary to M.S.'s assertion, Travis had moved out of the apartment in August 2017. These arguments certainly invited a response from

---

[24] *Dickerson* , 485 S.W.3d at 333; *See also Woodford v. Commonwealth*, 376 S.W.2d 526 (Ky. 1964) (counsel, in arguments to the jury, can draw inferences from facts in evidence); *Wood v. Commonwealth*, 56 S.W.2d 556 (Ky. 1933) (same).

[25] *Foley v. Commonwealth*, 953 S.W.2d 924, 940 (Ky. 1997).

[26] *See, e.g., Armstrong v. Commonwealth*, 517 S.W.2d 233 (Ky. 1974) (holding Commonwealth's Attorney's statements that he had worked with the officer a long time and the officer was honest and conscientious were improper); *Terry v. Commonwealth*, 471 S.W.2d 730 (Ky. 1971) (prosecutor's statement that he knew the defendant's alibi witnesses were "rotten to the core" was improper); *Jones v. Commonwealth*, 313 Ky. 827, 233 S.W.2d 1007 (1950) (finding the prosecutor's statements of personal opinion about defendant's witnesses were improper).

the Commonwealth, but the question this Court is left with is whether the response crossed over from permissible support utilizing evidence and inferences to impermissibly personally vouching for M.S.'s truthfulness.

Turning to the specific closing argument comments at issue, the statement "I know you believe this child" is not a personal expression of the Commonwealth's belief in M.S.; it was an expression of its belief that the jury believed M.S. Furthermore, the Commonwealth followed it up with a rendition of facts from Travis's testimony which the jury would be required to believe if they thought M.S. was untruthful. The Commonwealth focused on the dubious nature of Travis's contention that it regularly took him ninety minutes to travel the twenty-six miles between the Frankfort and Shelbyville exits on I-64 and his failure to provide any corroboration of his extreme work schedule.

Second, when the Commonwealth stated M.S. "was one-hundred percent credible, one-hundred percent believable," it was not framed as the personal belief of the Commonwealth's Attorney. The statement was tied to a subsequent listing of evidence and inferences drawn from the testimony of other witnesses. The Commonwealth's Attorney emphasized that Craig Gonzales witnessed Travis throwing away a twin mattress when he attempted to do a home visit. M.S. slept on a twin bed, which would seem to allow for a logical inference for the jury that Travis was disposing of evidence. Consistent with M.S.'s own testimony, Tiffany Parsons testified to M.S.'s concerns over others knowing of the abuse and the kind of scrutiny it would possibly bring. Parsons's testimony called into question the defense's implication that M.S. made up the charges to

18

get attention. Dr. Sugarman testified as to what types of pain and discomfort a victim of M.S.'s age would experience, and M.S. testified to pain and discomfort consistent with that description. Each of these supported the statement that M.S. was totally credible.

In addition to the prosecutor's support of M.S.'s testimony, he made a factual misstatement regarding when Travis took Juanita's last name. In closing, the Commonwealth's Attorney stated, "he started using another name by the time this case started." The obvious implication was that Travis changed his last name in some effort to avoid prosecution. Nicole's actual testimony was that Travis took Juanita's last name "when they married." The defense did not object to the Commonwealth's misstatement. We must determine whether the prosecutor's actions in making this statement amounted to flagrant prosecutorial misconduct, applying the aforementioned four-factor test.[27] This statement may have prejudiced Travis through the implication that he changed his name in response to the case against him. However, the statement was isolated, one sentence in the Commonwealth's closing and not dwelled upon thereafter. It was part of the Commonwealth's closing, but whether the phrasing was intentional or merely the Commonwealth's unintentional misstatement is unclear. Further, the trial was relatively short, and the jury heard Nicole herself testify to the issue less than ninety minutes earlier. The evidence against Travis was strong, especially given the highly credible

---

[27] *Murphy*, 509 S.W.3d at 54.

testimony of M.C. After weighing the four factors, we conclude that the Commonwealth's misstatement as to when Travis took Juanita's name was not flagrant misconduct.

That leaves the Commonwealth's Attorney's final questionable statement regarding M.S.'s credibility:

> "there wasn't a thing that come out of her mouth that wasn't true. Not a thing. I never saw a face like that before. Trust that. Put little girls like that, that little girl on the stand, I never had one like that. It's the most credible witness I ever saw. Everything she told you is true."

The statement here is readily distinguished from the Commonwealth's earlier statements. The Commonwealth's Attorney inserted himself into the question of veracity, specifically by stating, "I never had one like that. It's the most credible witness I ever saw." He was personally vouching for M.S.'s truthfulness and veracity and did so, not by supporting it with other evidence, but by reiterating what M.S. said on the stand. The prosecution and defense of sexual offenses is difficult and emotional, however attorneys for both sides must refrain from acting outside the bounds of the rules to ensure fair trials.

We acknowledge that simply using the phrase "I never" or "I ever saw" is not prosecutorial misconduct if adequately supported by evidence or if the phrases were not used intentionally to bolster the credibility of the witness.[28]

---

[28] *Padgett v. Commonwealth*, 312 S.W.3d 336, 353 (Ky. 2010) (holding that simply using the words "I think" or "we think" in closing is not misconduct where there is no suggestion that the phrases were used to attempt to inflame the jury, bolster credibility of witnesses by personally vouching for them, or to make the jury consider anything other than evidence presented at trial).

The Commonwealth's Attorney supported his statement through an appeal to the jury's common sense that M.S.'s testimony was completely consistent with the language a witness of M.S.'s age would use in describing such traumatic events. Even with this nod to the evidence, it is apparent to us the Commonwealth's Attorney's statement was an effort to improperly imbue M.S. with the prestige of the Commonwealth. Finding the statement to be improper, and given that the issue is unpreserved, we must turn to the question of whether that statement alone amounts to flagrant misconduct warranting a new trial.

Turning again to our four-part test for flagrant prosecutorial misconnect, we view the improper statement in light of the whole trial.[29] The first factor weighs in Travis's favor. There is no question the Commonwealth's improper vouching for M.S. prejudiced Travis in light of a case that turned in large part on the relative credibility of M.S. Looking to the second factor, the improper statement itself was isolated, but admittedly part of a greater Commonwealth narrative dwelling on the relative credibility of the two principals. Third, the statement was deliberately placed in front of the jury. Unlike the earlier utterance of "Eww" or "Ooh," it was not spontaneous; rather, it appeared as part of a prepared closing argument.

Finally, as discussed in our analysis of the Commonwealth's improper morality question, we must evaluate the strength of the case against Travis.

---

[29] *See Murphy,* 509 S.W.3d at 50; *Brafman,* 612 S.W.3d at 861.

21

M.S. was supported by the previously described testimony of Craig Gonzales, Dr. Sugarman, and Tiffany Parsons. There were no allegations or evidence of coaching or evidence of motive for M.S. to fabricate the events. As noted previously, the Commonwealth ably and properly called into question Travis's credibility and impeached Travis's basic contention that he never had an opportunity to commit the acts described by M.S. In balancing the four factors, we hold the Commonwealth's Attorney's statement was flagrant misconduct with the first three factors all weighing heavily for Travis, while only the last, the strength of the evidence against the accused, weighs in favor of the Commonwealth.

Addressing the second part of the test for whether flagrant misconduct requires reversal, we hold that while the Commonwealth's morality question and closing statement represented misconduct, they did not render Travis's trial fundamentally unfair and do not warrant reversal.[30] We acknowledge even with the substantial impeachment of Travis's testimony, a reasonable juror could have found M.S.'s statements alone insufficient to render a guilty verdict absent the Commonwealth's improper argument. But the jury did not have to rely on M.S.'s statements alone. Craig Gonzales, Tiffany Parson, and Dr. Sugarman all testified in ways that reasonably permitted the jury to find M.S. much more credible than Travis. We concede that it was improper for counsel to utilize an unauthorized means of attesting to M.S.'s credibility, but even if

---

[30] *Matheney*, 191 S.W.3d at 606 (quoting *Barnes*, 91 S.W.3d at 568).

unauthorized, we must be persuaded it had a sufficient prejudicial effect to render Travis's trial unfair.[31] We hold that even absent the Commonwealth's improper argument and question, there was not a "substantial possibility that the result would have been any different."[32] Although we admonish the Commonwealth from behaving in this manner in the future, we cannot hold that the Commonwealth's improper comments during its closing argument or question during cross-examination undermined the fairness of Travis's trial as a whole.

## B. Failure to renumber counts was not error.

Prior to the start of the trial, count one of Travis's indictment was dismissed. Despite this, when the Commonwealth read the indictment to the jury, it began stating "count two" and continued through five. Furthermore, during the guilt phase, the court made a single reference to "count three" when reading jury instruction four, and the jury instructions and verdict forms themselves retained the "count two" through "count five" language. Due to the dismissal of count one, Travis contends the counts should have been renumbered in any references to the jury and failing to do so resulted in a jury left to speculate as to what count one consisted of and why it was not before them. This argument is unpreserved, and Travis requests we review the issue for palpable error under RCr 10.26.

---

[31] *Armstrong*, 517 S.W.2d at 236 (concluding improper bolstering of police officer's testimony was insufficient to render trial unfair).

[32] *McIntosh*, 646 S.W.2d at 45.

Travis acknowledges he can find no case law directly supporting his argument. The closest cases on point deal with exposing a jury during the penalty phase to evidence of amended or dismissed charges. The Commonwealth argues that the trial court's failure to renumber the counts of the indictment was not an error, and even if it were, the error was harmless.[33]

Travis cites *Blane v. Commonwealth* for the proposition that "introducing the original charges of Appellant's prior convictions constitutes palpable error."[34] First, we note that in *Blane*, the introduction was testimony as to the nature and severity of the actual charge that had been amended down.[35] In the defense's remaining cited cases, this distinguishing feature is the same – the jury saw the actual nature and severity of the dismissed or amended charges.[36]

In the present case, the jury did not hear the nature or severity of the missing count. In fact, the charge that was contained in count one was *never mentioned*; the defense finds it only conspicuous by its absence. The issue was so subtle that from the dismissal two days prior to trial and through the entire trial, defense counsel never raised the issue of the count renumbering.

---

[33] *See U.S. v. Sivils*, 960 F.2d 587, 596-97 (6th. Cir. 1992) (holding trial court's reference to count that had been severed from the trial resulted in no prejudice and constituted harmless error).

[34] 364 S.W.3d 140, 153 (Ky. 2012).

[35] *Id.*

[36] *Stansbury v. Commonwealth*, 454 S.W.3d 293 (Ky. 2015) (trial court erred in permitting introduction of an exhibit during sentencing which showed three counts of first-degree wanton endangerment that had been dismissed); *Robinson v. Commonwealth*, 926 S.W.2d 853 (Ky. 1996) (court erred in permitting introduction of a printout during sentencing which showed both prior convictions and dismissed charges).

Palpable error requires the error to be "easily perceptible, plain, obvious and readily noticeable."[37] Travis may speculate that the jury had questions about the dismissed count and held it against him, but such speculation is not so apparent "that it jumps off the page…and cries out for relief."[38] We hold that the simple failure to renumber the counts, where no information is imparted on the jury as to the nature and severity of the missing count, is no error.

### III.    CONCLUSION

For the foregoing reasons, Travis Durrum's convictions for first-degree criminal abuse, first-degree rape, first-degree sexual abuse, two counts of first-degree sodomy, and the corresponding seventy-year prison sentence are affirmed.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Karen Shuff Maurer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General

---

[37] *Burns*, 957 S.W.2d at 222 (citing BLACK'S LAW DICTIONARY (6th ed. 1995)).

[38] *Chavies*, 374 S.W.3d at 323 (quoting *Alford*, 338 S.W.3d at 251 (Cunningham, J., concurring)).