# IMPORTANT NOTICE

## <u>"NOT TO BE PUBLISHED OPINION"</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: JUNE 25, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0549-MR

BENJAMIN WARD                                                        APPELLANT

V.

ON APPEAL FROM BOONE CIRCUIT COURT
HONORABLE REBECCA LESLIE KNIGHT, JUDGE
NO. 16-CR-00044

COMMONWEALTH OF KENTUCKY                                             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A jury of the Boone Circuit Court found Appellant Benjamin Ward guilty of one count of use of a minor in a sexual performance, one count of possession of matter portraying a sexual performance by a minor, and multiple counts of first-degree sexual abuse, third-degree sodomy, and third-degree rape.[1] The jury recommended a total sentence of 63 years, which the trial court imposed. Ward now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). Following a careful review, we affirm.

---

[1] Ward was previously tried and convicted of these same charges, which this Court reversed for failure of the trial court to strike a juror when there was reasonable ground to believe the juror would be unable to render an impartial verdict. *Ward v. Commonwealth*, 587 S.W.3d 312, 328-30 (Ky. 2019). The present convictions resulted from the retrial following our remand of the case to the Circuit Court.

## FACTUAL AND PROCEDURAL BACKGROUND

H.G.[2] moved to her father's house in Hebron, Kentucky, which was located across the street from Appellant Ward's residence. H.G.'s move was precipitated by her mother's drug addiction issues. After the move, H.G. did not get along with her father or stepmother.

H.G. met Ward and his wife, Cindy, and began to spend a lot of time at their home, eventually developing a close relationship with them. Ward began touching H.G. in a sexual way in 2009, when she was around 11 years old. Ward was in his fifties. He eventually began having oral and vaginal sex with H.G. when she was around 11 or 12 years old. H.G. testified to experiencing pain and being scared when these incidents occurred.

H.G. testified that she frequently texted and messaged Ward on various apps, and that she sent him lots of pictures, including nude photos. She further testified that Ward asked for nude photos frequently, that she sent him many such photos, and that he also directed her to wear certain clothing or use certain poses in photos. H.G. read text messages between Ward and herself to the jury that corroborated her testimony.[3]

In 2012, H.G. informed her father in a written letter that Ward was her "boyfriend" and that he had been trying to make her have sex with him for two years. H.G. later stated she did not reveal at this time that Ward was already

---

[2] We use initials here to protect the privacy of the child victim.

[3] In the text messages, Ward directed H.G. to wear a particular pair of shorts, to "do a striptease," and to bend over more in a video. He also referred to H.G. as his "wife," and stated "come home, I need to [expletive] you."

raping her because she was trying to protect Ward. H.G.'s father called the police. On January 30, 2013, the Child Advocacy Center (CAC) conducted an interview with H.G. in which she stated she wrote the letter to her father because Ward would not buy her an item she wanted. She disclosed Ward's messages to her but denied having any sexual contact with him. No charges were pursued at that time, and H.G. continued to sneak out to see the Wards even though she had been forbidden from visiting them. Ward continued to abuse and rape H.G.

Around this time, Ward's wife Cindy became suspicious of Ward's relationship with H.G. On Cindy's 50th birthday, she received an explicit message from Ward she believed was intended for H.G. and that included H.G.'s name. Cindy also testified at trial that in February 2014 she saw a nude image of H.G. on Ward's phone, and that Ward was "sitting in his chair squirming" and rubbing himself.

Cindy subsequently went to the police. During a controlled phone call between Cindy and Ward, Ward admitted to "sex texting" with H.G. but denied having sexual contact. Police subsequently executed a search warrant at the Wards' residence. Law enforcement seized and examined computer and electronic devices which revealed nude photographs of H.G. However, the images were not in an ordinary photo folder, but rather were in a thumbcache and thus viewable only with special software. At trial, a detective testified that Ward's computer had no password and thus was accessible by anyone. He also testified that while the nude images were in the thumbcache, he did not

3

know for how long they were there or even if a user, or which user, would have known it was there.

H.G. later disclosed Ward's abuse to her fiancé Austin. At Austin's urging, H.G. then disclosed Ward's abuse during an August 2015 CAC interview. Ward was indicted and, following a jury trial, convicted of use of a minor in a sexual performance, possession of matter portraying a sexual performance by a minor, first-degree sexual abuse, third-degree sodomy, and third-degree rape.[4] The jury recommended a total sentence of 63 years, which the trial court imposed. Ward now appeals as a matter of right.

## ANALYSIS

Ward raises four issues for our review: (1) whether testimony by H.G.'s fiancé was irrelevant, inadmissible hearsay, and impermissible bolstering; (2) whether the trial court improperly limited closing arguments to 15 minutes; (3) whether there was insufficient evidence to sustain Ward's conviction for possession of matter portraying a sexual performance by a minor; and (4) whether Ward suffered prejudice as a result of erroneous testimony regarding sentencing during the penalty phase of the trial. We review each issue in turn, providing additional facts as necessary.

### I. The Trial Court Did Not Abuse Its Discretion In Admitting Testimony By H.G.'s Fiancé.

Ward first argues that the trial court erred in admitting testimony by H.G.'s fiancé Austin. By way of background, Ward's counsel asked H.G. on

---

[4] Judge R. Leslie Knight presided over the trial sitting as a Special Judge.

4

cross-examination whether she or her mother had received monetary payments from a victim's compensation fund. Counsel asserted the questions were relevant because while H.G. denied sexual contact during the 2013 CAC interview, she made rape and sexual abuse allegations in her 2015 CAC interview, close in time to the alleged receipt of victim's compensation funds. H.G. testified she did not receive any funds and was unaware of her mother receiving any funds.

After this testimony, the Commonwealth stated its intention to call Austin to the stand. The Commonwealth sought to elicit testimony from Austin that H.G. told him about Ward's abuse and that he urged her to report it to law enforcement. The Commonwealth contended the testimony was relevant because the defense's questioning of H.G. regarding the victim's compensation fund suggested that H.G. had a financial motive to lie, and the Commonwealth therefore needed to rebut that suggestion by demonstrating that H.G. reported the abuse due to Austin's urging rather than monetary payments. Defense counsel objected that the testimony was not relevant and thus inadmissible. The trial court overruled the objection and allowed the Commonwealth to proceed with Austin's testimony.

Austin testified that Ward was "not a very good person" and that H.G. had told him about "the whole situation" with Ward. When the Commonwealth inquired further, Austin stated he was talking about "how [Ward] was raping her, I guess." Austin testified H.G. was upset and scared, and that he encouraged her "to go tell." Austin's testimony lasted around six minutes,

5

during which he did not go into any further detail regarding what H.G. had reported to him about Ward.

Ward now contends admission of this testimony was error. Ward first argues that Austin's testimony was irrelevant and thus inadmissible. Ward objected to Austin's testimony on grounds of relevance, and thus this argument is preserved. Kentucky Rule of Evidence ("KRE") 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected [and, if] the ruling is one admitting evidence, a timely objection . . . appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."). We review evidentiary rulings for abuse of discretion, and thus consider whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Roberson v. Commonwealth*, 694 S.W.3d 272, 279 (Ky. 2024) (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

KRE 402 provides that "[e]vidence which is not relevant is not admissible." Thus, evidence is admissible only if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Ward first asserts Austin's testimony was irrelevant because H.G. testified she was unaware of her family receiving any victim's compensation funds, and because Austin was unaware of when H.G. disclosed the abuse to him. However, defense counsel's questioning of H.G. about victim's

6

compensation funds would naturally raise in the minds of the jury a question as to whether H.G. made her allegations for financial gain. Once such a specter was raised, it became relevant for the Commonwealth to demonstrate H.G. reported the abuse not for financial gain, but rather for another reason— the urging of her fiancé after her disclosure of Ward's abuse. Further, the mere fact that Austin did not recall *when* H.G. disclosed the abuse was generally immaterial and did not render his testimony irrelevant. Thus, because Austin's testimony that he urged H.G. to disclose the abuse made it more probable that she reported the abuse for that reason rather than for financial gain, the evidence was relevant and admissible under KRE 402.

Ward further asserts that even if relevant, Austin's testimony was more prejudicial than probative because Austin stated Ward was "not a very good person" and that Ward had raped H.G. KRE 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice." In considering whether evidence should be excluded under KRE 403, a trial court must consider three factors "the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014). On appellate review, we "must consider the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum prejudicial value." *Id.*

We perceive no undue prejudice in the statement that Ward was "not a very good person." Evidence that is "unduly" prejudicial is that which

> is harmful beyond its natural probative force: "Evidence is unfairly prejudicial only if . . . it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'"

*McLemore v. Commonwealth*, 590 S.W.3d 229, 234 (Ky. 2019) (citation omitted). A mild reference to the defendant as "not a very good person" does not rise to the level of opprobrium that might be expected to cause a jury to base its decisions on factors beyond the core facts of the case. Thus, there was no abuse of discretion in the admission of that testimony.

Nor do we perceive any abuse of discretion in allowing Austin to testify that Ward had been raping H.G. First, that testimony was highly probative of the purpose for which the Commonwealth sought to introduce it—namely, to establish that H.G. reported Ward's abuse at Austin's urging rather than for financial gain. Indeed, Austin's testimony that Ward had been raping H.G. was strong evidence that he believed H.G. had been subjected to severe criminal abuse, and thus lent credibility to his assertion that he therefore urged H.G. to report that abuse.

Second, while the assertion was also plainly prejudicial, it was not unduly so. *See Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012) ("KRE 403 . . . does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case."). Austin did not go into graphic detail nor linger further on the point, nor did the Commonwealth.

8

Indeed, Austin's testimony was cursory, involved only the bare assertion that Ward had raped H.G., and lasted less than ten minutes. Thus, because the probative value of the testimony was strong and the testimony was of limited prejudicial impact, we find no abuse of discretion in admitting that testimony.

While Ward argued relevance to the trial court, he did not argue there, as he does now, that Austin's testimony was also inadmissible hearsay and bolstering. As such, those arguments are unpreserved and thus reviewable only for palpable error.[5] *Id.*; Rule of Criminal Procedure (RCr) 10.26 ("A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

In determining whether an error is palpable, we consider

> "whether on the whole case there is a substantial possibility that the result would have been any different." To be palpable, an error must be "easily perceptible, plain, obvious and readily noticeable." A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings. "It should be so egregious that it jumps off the page . . . and cries out for relief."

*Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citations omitted). Even where an error is palpable and thus meets this standard, however, relief is warranted only where the error also results in manifest injustice.

*Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018). An error results in

---

[5] Ward requests palpable error review as to his hearsay and bolstering arguments.

manifest injustice if it "so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Conrad v. Commonwealth,* 534 S.W.3d 779, 783 (Ky. 2017) (quoting *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006)).

Ward asserts that H.G.'s statement to Austin that Ward raped her was not admissible as a prior consistent statement, and thus was inadmissible hearsay. More particularly, Ward asserts the Commonwealth failed to establish that H.G. made the statements to Austin *before* the alleged receipt of victim's compensation funds provided a financial motive to make false allegations against Ward.

KRE 801A(a)(2) provides that

> [a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement . . . and the statement is . . . [c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

As both parties acknowledge, the Rule applies only "to statements the declarant made *pre-dating* their supposed motive to fabricate their sworn testimony." *Riggle v. Commonwealth,* 686 S.W.3d 105, 114 (Ky. 2023).

However, we have previously explained that a "post-motive" prior consistent statement nonetheless also may be admitted—independently of KRE 801A—to rehabilitate a witness after an express or implied suggestion at trial that the witness's testimony was fabricated or motivated by improper purpose or motive:

10

> A witness's prior consistent statements made post-motive are naturally not barred by the hearsay rule when they do not constitute hearsay—namely when offered primarily for rehabilitative, not substantive purposes. In such a case, the statement is not admitted under KRE 801A(a)(2) as a prior consistent statement. Indeed, KRE 801A(a)(2) does not even address this scenario. Rather the statement is admitted as non-hearsay because it is offered not for the truth of the matter but to rehabilitate credibility.

*Id.* (cleaned up).

Such was the case here. By cross-examining H.G. about the victim's compensation fund, defense counsel implied H.G. had a financial motive to make allegations against Ward. In response, the Commonwealth called Austin for the express purpose of rebutting the implication that H.G. made her allegations out of financial motive by demonstrating that, in reality, H.G. reported Ward's abuse at Austin's urging after she disclosed Ward's crimes to Austin. Thus, Austin's testimony regarding H.G.'s statements to him were not admitted to prove the truth of the matter asserted—that Ward had actually raped and abused H.G.—but rather to prove that H.G. reported the abuse at Austin's urging rather than for financial gain. As such, Austin's testimony did not involve impermissible hearsay. *See id.;* KRE 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*") (emphasis added).

Nor do we find that Austin's testimony constituted improper bolstering. Ward points us to *Stephens v. Commonwealth,* 680 S.W.3d 887 (Ky. 2023), and *Chavies v. Commonwealth,* 374 S.W.3d 313 (Ky. 2012), for the proposition that

11

a witness's repetition of a victim's allegations constitutes improper bolstering. Admittedly, both cases—and many others—hold that it is generally improper for a witness, *in the absence of an allegation of recent fabrication or improper purpose or motive*, to bolster a victim's allegations by repeating hearsay statements the victim previously made making the same allegations. *See, e.g., Stephens*, 680 S.W.3d at 898. However, *Stephens* and *Chavies* are distinguishable because, unlike here, neither involved a witness's repetition of the victim's allegations *to rebut* a defense suggestion that the victim's allegations were a recent fabrication or motivated by an improper purpose or motive. *Stephens*, 680 S.W.3d at 898 ("[Defendant] did not imply a charge of recent fabrication by [the victim]."); *Chavies*, 374 S.W.3d at 321-22.

In contrast, in the present case, the Commonwealth elicited Austin's testimony that H.G. told him Ward had raped and abused her in an effort to confront the defense's implication that H.G. only reported the abuse for financial gain. We have previously held that where a witness repeats a witness's allegations for the purpose of confronting an implication of fabrication or improper purpose or motive, such testimony does not constitute improper bolstering but rather appropriate rehabilitation. *Riggle*, 686 S.W.3d at 115 (holding that admission of prior consistent statement of sexual abuse was not improper bolstering because it "went to rehabilitate [the victim's] credibility after multiple insinuations from defense counsel that [the victim] had fabricated her testimony."). We further note that, unlike *Stephens*, where the testimony went far beyond what was necessary to establish that the victim

12

had disclosed a rape to the witness, Austin provided no more detail than was necessary to prove that H.G. had disclosed Ward's crimes to him. *Compare Stephens*, 680 S.W.3d at 899 (finding statements were impermissible bolstering hearsay because they went "far beyond" what was necessary merely to establish that the victim disclosed). Thus, because Austin testified to H.G.'s disclosures only for the purpose of rehabilitating her after the implication of improper financial motive, the testimony was not improper bolstering and the trial court did not abuse its discretion in admitting it.

## II. The Trial Court Did Not Abuse Its Discretion In Limiting Closing Argument To Fifteen Minutes.

Ward next argues the trial court erred in limiting each side to only 15 minutes of closing argument. When the trial court announced this limitation, Ward objected that 15 minutes was not sufficient given the complexity and length of the case. Thus, this allegation of error is preserved. RCr 9.22.

Under our long-standing guidelines for determining an appropriate length of time for closing arguments, "[t]he trial court should, of course, allow counsel for the accused in every case reasonable time and opportunity to present the reasons why there should be an acquittal." *Young v. Commonwealth*, 119 S.W.2d 647, 651 (Ky. 1938). The determination of whether the allotted time is reasonable "depends upon the facts and circumstances of each particular case." *Id.* Relevant factors to consider include the "complexity or simplicity [of the case], the amount and character, whether direct or circumstantial, of the testimony taken, the number of witnesses which have been examined, contradictions in the evidence, and the

13

time which has already been consumed" in hearing the case. *Thomas v. Commonwealth*, 193 S.W. 653, 656 (Ky. 1917) (citation omitted).

We review a trial court's temporal limitation of closing argument for abuse of discretion. *Young*, 119 S.W.2d at 650 ("The limiting of the argument is always in the sound discretion of the trial court and only when that discretion is abused will this court reverse a judgment."). Notably, reversal is warranted only where it is shown that the temporal limitation operates to the prejudice of the defendant. *Stout v. Commonwealth*, 146 S.W. 407 (Ky. 1912) (noting that the time allotted for argument is not reversible error "unless it affirmatively appears that this discretion has been abused to the prejudice of the accused."); RCr 9.24 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.").

Here, Ward argues 15 minutes was an insufficient amount of time for closing argument because trial lasted for several days, involved more than 100 exhibits, and related to allegations covering a span of years. Ward also notes there was a significant amount of digital forensic evidence, and that with additional time he would have presented argument to the jury regarding metadata and the forensic evidence. Ward further asserts that with additional time, he also could have highlighted the lack of evidence of a video call or messages including photos in the record. Ward further points to H.G.'s changing allegations against him and the fact that his expert was called out of

14

order (and thus temporally distant from the jury's deliberations) as warranting further time for closing argument.

While the trial judge offered no factual basis for the 15-minute limit on each side's closing arguments—and while we also cannot independently think of any, nor do we consider such a limitation in a case such as this one good practice—we nonetheless also conclude reversal is not warranted because Ward has not shown that he suffered any actual prejudice as a result of the limitation. Though the trial lasted several days, it ultimately involved straightforward determinations of whether Ward possessed images of H.G. engaged in a sexual performance at his request, and whether he had engaged in various forms of sexual contact with H.G. The jury instructions setting forth the substantive law governing these charges covered a total of 11 pages, each of which was at least half devoid of any text whatsoever. Thus, we do not perceive a complexity so significant that we can find prejudice merely from the nature of the case itself. In addition, while Ward cursorily asserts he was prevented from providing evidence regarding metadata or forensic evidence, he does not further explain or develop that argument in any meaningful way to demonstrate that he was *prejudiced* by the alleged inability to discuss such evidence. Finally, while Ward also asserts he lacked an opportunity to point out a lack of video evidence or messages that included illicit photographic content, such an observation could, of course, be highlighted in a matter of seconds. Thus, because Ward has not demonstrated that he suffered any

actual prejudice as a result of the temporal limitation, we do not find that it warrants reversal.

### III. Ward Was Not Entitled To A Directed Verdict On The Possession Charge.

Ward next argues there was insufficient evidence to sustain his conviction for possession of matter portraying a sexual performance of a minor. Ward moved for directed verdict on this count and thus his argument is preserved.

The standards for a motion for directed verdict in a criminal case are well established:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187-88.

When reviewing a trial court's decision regarding directed verdict in a criminal case, our test "is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* at 187. In sum, "the relevant question is

16

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Crabtree v. Commonwealth*, 455 S.W.3d 390, 396 (Ky. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Kentucky Revised Statute (KRS) 531.335(1)(a) provides in relevant part that a person is guilty of possession of matter portraying a sexual performance of a minor "when, having knowledge of its content, character, and that the sexual performance is by a minor, he or she . . . [k]nowingly has in his or her possession or control any matter which visually depicts an actual sexual performance by a minor person." As this statutory language makes plain, a defendant is guilty only if he knows that he has such matter in his possession or control, knows the content and character of the matter, and knows that the matter involves a sexual performance by a minor. *Id.*; *Crabtree*, 455 S.W.3d at 402 ("The *mens rea* requirements of KRS 531.355 are satisfied by showing that the defendant knew the videos were child pornography and that he knowingly possessed them."). Thus, there is no crime of mere negligent but unknowing possession of such material. *Crabtree*, 455 S.W.3d at 398. Rather, the requisite mental state required for criminal liability is "described in a single word—awareness." *Id.* (citation omitted).

Ward's conviction for possession of matter portraying a sexual performance by a minor followed the discovery of nude images of H.G. in his computer's "thumbcache" which were viewable only with special software. We

17

have previously explained the distinction between ordinary images accessible by any ordinary computer user, and "thumbcache" images such as those at issue here viewable only with special software:

> [T]he thumbcache allows for the quicker display of images without having to load them from the hard drive each time, and works as an index of images and videos. . . . The thumbnail is a smaller version of the image or the first frame of a video, and serves as a preview of the original file. Separate thumbnail images are automatically generated in the thumbcache, which is a separate file.

> [T]he thumbcache is separate from the original image file. Thumbcache images are not deleted when the original file is deleted, and the images contained in the cache are not readily accessible to the average user but instead require special software to view.

*Id.* at 403. However, images that led to thumbnails found in a thumbcache must have been on the computer at one time. *Id.* ("The original images that led to the thumbcache images were not found on [defendant's] computer, *though they had to have been there at one time.*") (emphasis added).

Ward argues that the proof at trial was insufficient to allow a reasonable juror to conclude that he knowingly possessed the nude images of H.G. located in his computer's thumbcache—*i.e.,* that he was aware such images were on his computer. Ward points out that both his expert and the Commonwealth's expert agreed it is unknown how the photos came to be on Ward's computer, or if they were even viewed. The Commonwealth's expert testified that the photos were not located in the computer's photo folder where they might be accessed by an ordinary computer user. Rather, the photos were located in the thumbcache that could not be accessed without special software. Such

18

software was not found on Ward's computer.  Ward further points out that there was also testimony that his computer was not password-protected, and thus was accessible by anyone.

Ward argues that given these facts, his conviction is similar to that of the defendant in *Crabtree* and likewise should be reversed.  However, *Crabtree* is distinguishable.  In *Crabtree*, the defendant was convicted on the basis of images containing child pornography found in his computer's thumbcache.  455 S.W.3d at 405.  We reversed because while the thumbcache images were proof of prior possession of the original images that lead to the thumbcache images, they were not—without more—proof of *knowing* possession of the original images:

> At the time the original images are downloaded (and the thumbcache image is created), the defendant possesses the image.  That the original download occurred, even though the images are later deleted, is shown indirectly by the persistence of the thumbcache images.  Those images show that at some point in the past, the defendant possessed the original images.  The thumbcache is evidence of a previous possession just as a fingerprint can be evidence of a defendant's earlier presence at a crime scene.
>
> The Commonwealth's burden, however, is not merely to show that Crabtree literally had the original images on his computer but to show he *knowingly* possessed them.  In other words, although the thumbcache is evidence of prior possession (at least in some sense), is it evidence of knowing prior possession of the original images?
>
> By itself, it is not.  There are numerous reasons why those images could have been on Crabtree's computer [for example, innocent searches that returned child pornography or unintentional downloading of files with innocent file names that contained child pornography].

19

*Id.* Thus, because "the Commonwealth had no evidence related to the source of the original files, what their names were, or anything," there was not sufficient evidence to show knowing possession as required to sustain the conviction. *Id.*

Here, in contrast, the Commonwealth *did* present proof of how Ward came to be in possession of nude images of H.G. that led to the creation of the thumbcache images. More particularly, H.G. testified that she recognized the images and that she had sent them to Ward. Indeed, the photos were of H.G. herself. H.G. also read to the jury text messages in which Ward directed H.G. to wear certain clothing, do certain acts, and adopt certain poses in photos he asked her to send. A detective also testified that because the thumbnails were present on Ward's computer, the original images also must have been present at some point.

Taken together—and unlike *Crabtree* in which the Commonwealth lacked evidence as to how the images came to be in the defendant's thumbcache—this proof was sufficient to allow a reasonable juror to conclude beyond a reasonable doubt that Ward knowingly possessed the nude images of H.G. Significantly, "direct proof of knowledge is not necessary" to obtain a conviction for possession of child pornography. *Id.* at 399. Rather, "[p]roof of actual knowledge can be by circumstantial evidence." *Id.* (quoting *Love v. Commonwealth*, 55 S.W.3d 816, 825 (Ky. 2001)). And where there is sufficient circumstantial evidence from which the jury may infer a culpable mental state, the case is properly submitted to the jury. *Id.* at 399-400. Quite simply, it can reasonably be inferred from H.G.'s testimony that she recognized and sent

20

those photos to Ward that he knowingly received and possessed them.
Moreover, H.G.'s testimony that she sent Ward the photos shown in the
thumbcache demonstrated not only that Ward knowingly possessed *some* nude
photos of H.G., but rather that he knowingly possessed the *same* photos for
which he was charged. *See id.* at 408 ("[T]here must be an evidentiary nexus
between the evidence that could show knowledge and the illegal images found
on the computer."). Thus, because there was sufficient evidence to allow a
reasonable juror to conclude beyond a reasonable doubt that Ward knowingly
possessed the nude images of H.G. that she had sent him, the trial court did
not err in denying Ward's motion for directed verdict on the possession charge.

IV. **Though The Parole Officer's Penalty Phase Testimony Regarding Parole Eligibility And Time Credits Was Incorrect, It Did Not Result In Palpable Error.**

Ward next argues reversal is warranted because erroneous sentencing
information was presented to the jury during the penalty phase of the trial.
Ward acknowledges this error is unpreserved, and we therefore review for
palpable error.

During the penalty phase, the Commonwealth called a parole officer to
testify about, among other things, parole eligibility, time credits, and
serve-outs. During that testimony, the officer told the jury that violent
offenders could receive a 7-day reduction of their sentence for each month of
good behavior. He sometimes referred to the credit as "good time" credit, and

21

at other times referred to it as "meritorious" credit.[6]  The officer further testified that while violent offenders must serve 85% of their sentence before being considered for parole, good behavior credit could accumulate such that the offender would be deemed to have completed the sentence and released even before the offender reached the necessary 85% threshold for an initial parole hearing.  He further provided an example in which someone who was given a 20-year sentence—and thus entitled to appear before the parole board at 17 years—might be released after 14 or 15 years due to the accumulation of good behavior credit.  On cross-examination, Ward's counsel clarified that under the relevant statute, a violent offender should not be released until they have served at least 85% of the sentence, or at least 20 years, whichever comes first.

Under KRS 439.3401(1)(a)(3), Ward qualifies as a violent offender because he was convicted of a felony sexual offense.  The statute also makes clear that a violent offender sentenced to a term of years "shall not be released on . . . parole . . . until he or she has served at least eighty-five percent (85%) of the sentence imposed."  KRS 439.3401(4).[7]  Thus, the parole officer's testimony that good behavior credits could accumulate and allow a violent offender to be

---

[6] The full context of the officer's testimony makes clear he was addressing "good behavior" credit rather than "meritorious service" credit.  Indeed, he told the jury the credit he was discussing was earned "as long as you're doing what you're supposed to be doing in the institution, not getting any write-ups, you're not in any fights, as long as you are doing what they're telling you to do."

[7] Technically, prior versions of this statute were in effect at the time of the crimes at issue here.  However, the differences between the prior and current versions are immaterial as both would require Ward to serve 85% of his sentence before he could be considered for parole.  We therefore cite to the present version for ease of reference.

released prior to reaching the 85% threshold was incorrect. *See James v. Commonwealth*, 681 S.W.3d 60, 73 (Ky. 2023) ("[A] prisoner does not actually receive good time credit until he or she reaches the minimum parole eligibility."). In addition, the officer's testimony was mistaken insofar as he sometimes referred to "good behavior" credit as "meritorious" credit. *Compare* KRS 197.045(1)(b)(1) (addressing "good behavior" credit) *and* KRS 197.045(1)(b)(2) (addressing "meritorious service" credit).

However, we do not find those errors to have resulted in manifest injustice. As noted above, manifest injustice occurs only where the error so seriously affects the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable. *Conrad*, 534 S.W.3d at 783. While the officer incorrectly testified that a violent offender could receive good behavior credits and such credits might result in release before the 85% threshold required for a violent offender to be considered for parole, defense counsel significantly mitigated that error by subsequently eliciting testimony that, in fact, such offenders must serve 85% of their sentence before they can be released on parole. *See James*, 681 S.W.3d at 74 (finding no palpable error where parole officer incorrectly stated good time credit can affect parole eligibility, given that Commonwealth subsequently pointed out that parole was available only after 20 years). While defense counsel did not specifically address the interplay of time credits with the 85% threshold, the jury nonetheless was left with the correct impression that the 85% threshold had to be met before parole could be considered. Moreover, there is no indication the

23

Commonwealth relied upon the officer's incorrect testimony in order to obtain a higher sentence from the jury. *Compare Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005) (finding palpable error where Commonwealth in closing argument pointed to inaccurate testimony that good behavior credit could affect parole eligibility) *and James*, 681 S.W.3d at 74 (finding no palpable error where subsequent testimony correctly stated parole eligibility requirements and "[t]he Commonwealth did not reference parole eligibility or the effect of any good time credits during its closing argument."). Indeed, in its closing argument, the Commonwealth did not mention at all the timing or even the possibility that Ward might be placed on parole. Finally, the officer's mistaken reference to "good behavior" credit as "meritorious" credit was wholly harmless, as it was clear he was referring only to "good behavior" credit. In sum, though the testimony was erroneous, it did not so seriously undermine the fairness, integrity, or public reputation of the proceedings as to be shocking or jurisprudentially intolerable. As such, the testimony did not constitute palpable error warranting reversal.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Boone Circuit Court.

All sitting. Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only by separate opinion which Lambert, C.J., joins.

24

THOMPSON, J., CONCURRING IN RESULT ONLY: Given the relative complexity of the case and the evidence presented, the trial court abused its discretion in limiting closing argument to fifteen minutes. However, the trial court's error was ultimately harmless.

Accordingly, I concur in result only.

Lambert, C.J., joins.

COUNSEL FOR APPELLANT:

Erin Hoffman Yang
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Graham Pilotte
Assistant Solicitor General